Camille N. Johnson (5494)
Judith D. Wolferts (7023)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Suite 1100
P.O. Box 45000
Salt Lake City, Utah  84110-5000
Telephone:  (801) 521-9000
Fax:  (801) 363-0400
*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**NORTHERN DIVISION**

| | |
|---|---|
| SARAH MOJAZZA, an individual,<br><br>       Plaintiff,<br><br>   vs.<br><br>FARMINGTON CITY, a Utah municipal corporation,<br><br>      Defendant. | **MOTION AND MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:14-CV-00017-DN<br><br>Judge David O. Nuffer<br><br>Magistrate Judge Evelyn J. Furse |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION ........................................................................................... vi

STATEMENT OF FACTS ................................................................................ xi

    A.     Background .................................................................... xi

    B.     Sexual Harassment Policy and Training ............................ xii

    C.     Ms. Mojazza's Testimony ................................................ xv

    D.     Sexual Bantering/Conduct ............................................ xviii

    E.     Ms. Mojazza's Use of Profanity in the Workplace ........... xviii

    F.     The Altercation ........................................................... xviii

    G.     Workman's Testimony and Statement ............................... xix

    H.     Mojazza Talks to Thurgood ............................................ xxi

    I.     Text Message ............................................................... xxii

    J.     Work Clothing for Ms. Mojazza ..................................... xxiii

    K.     Ms. Mojazza's Termination ........................................... xxiii

    L.     Brian Thurgood Testimony ............................................ xxvi

    M.     Todd Smith Statement and Testimony .............................. xxvi

    N.     Exit Interview ............................................................. xxix

    O.     Sexual Harassment Investigation ................................... xxxiv

    P.     Termination of Workman .............................................. xxxv

    Q.     Notice to Mojazza of Investigation Result ....................... xxxv

STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS ...................... xxxvi

    I.     TITLE VII CO-WORKER SEXUAL HARASSMENT CLAIM. .................. xxxvi

        A.     Burdens of Proof For Harassment By Non-Supervisor ....................... xxxvi

B.   No Constructive Knowledge For Prima Facie Case. ........................... xxxvi

C.   No Actual Knowledge Shown. ......................................... xxxviii

D.   Unreasonable Failure To Take Advantage of
     Preventive/Corrective Action.................................................... xl

E.   The City's Preventive and Remedial Actions. ........................................ xlii

F.   The City's Correction of Sexual Harassment ........................................ xlvi

II.   TITLE VII GENDER DISCRIMINATION CLAIM. ..................................... xlviii

A.   No *Prima Facie* Case............................................................. xlviii

B.   City's Legitimate, Non-Discriminatory Reason for
     Termination......................................................................... xlix

C.   Once Burden of Production Met, Employee Must Show
     Pretext. ................................................................................ l

D.   Strong Inference of No Discrimination Since Chief Smith
     Hired and Fired. .................................................................. lii

III.   TITLE VII RETALIATION CLAIM. ................................................. liii

A.   Retaliation Claims Can Be Shown Through Circumstantial or
     Direct Evidence.................................................................... liii

B.   No Direct Evidence Shown, *i.e.,* Mixed-Motive Theory. ........................ liii

C.   Even If Retaliatory Animus Was Shown, The City Would
     Take Same Action................................................................. liv

D.   Retaliation Not Shown Through Circumstantial Evidence...................... lv

E.   A *Prima Facie*  Case of Retaliation Probably Cannot Be
     Shown. ............................................................................... lv

F.   City Can Show a Legitimate, Non-Discriminatory Reason..................... lvi

G.   No Pretext Can Be Shown. ..................................................... lvii

H.   Strong Inference of No Discrimination Because Chief Smith
     Hired and Fired. .................................................................. 1

ARGUMENT ...................................................................................... 1

I.      THE SEXUAL HARASSMENT CLAIM SHOULD BE DISMISSED. ............................................................................................ 1

     A.      The City Had No Constructive Knowledge ................................... 2

     B.      Actual Knowledge Was Only After Ms. Mojazza's Exit Interview. ...................................................................................... 3

     C.      The City's Remedial And Corrective Actions Were Adequate. ................. 5

II.      THERE WAS NO GENDER DISCRIMINATION. ............................................. 7

     A.      Ms. Mojazza Cannot Establish a *Prima Facie* Case. .................................. 8

     B.      The City Can Articulate a Legitimate, Non-Discriminatory Reason For Termination. ...................................................................................... 8

     C.      Ms. Mojazza Cannot Show Pretext ........................................................... 9

III.      SUMMARY JUDGMENT IS WARRANTED ON THE RETALIATION CLAIM. ...................................................................................... 11

     A.      Ms. Mojazza Cannot Show Retaliation Through Direct Evidence. ...................................................................................... 11

     B.      Ms. Mojazza Cannot Prove Retaliation Through Indirect or Circumstantial Evidence. ...................................................................................... 12

     C.      Ms. Mojazza Cannot Establish a *Prima Facie* Case. ................................ 13

     D.      The City Can Show a Legitimate, Non-Discriminatory Reason for Termination. ...................................................................................... 13

     E.      Ms. Mojazza Cannot Show Pretext ........................................................... 14

CONCLUSION .................................................................................................................... 16

CERTIFICATE OF SERVICE ............................................................................................ 17

# TABLE OF AUTHORITIES

## CASES

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) ...................... xxxvi, xxxviii, xliii, 2

*Annett v. University of KS*, 371 F.3d 1233 (10th Cir. 2004) ................................................... lvii, 15

*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177 (10th Cir. 2006) ................................. lii, 1, 10, 15

*Aramburu v. Boeing Co.,* 112 F.3d 1398 (10th Cir. 1997) ........................................................ li, 9

*Argo v. Blue Cross & Blue Shield of KS, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) lv, lviii, 13, 14

*Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir. 1996) ............................................ li, 9

*Clark v. Cache Valley Elec. Co.*, 2013 WL 3873219 (D. Utah 2013) ........................... lviii, 14, 16

*Conatzer v. Medical Prof. Bldg. Servs., Inc.*, 255 F.Supp.2d 1259 (N.D. Okla. 2003) .......... xliv, 6

*DeBord v. Mercy Health Sys. Of KS*. 737 F.3d 642 (10th Cir. 2013) ......................................... xliii

*Dunlap v. Spec Pro, Inc.*, 939 F.Supp.2d 1075 (D. Colo. 2013) ........................ xxxvi, xlii, xliii, 2

*Faragher v. City of Boca Rotan*, 524 U.S. 775 (1998) ............................................................. xl, 4

*Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305 (11th Cir. 2011) ................................... xlvi

*Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217 (10th Cir. 2008) ................................. liii, liv, 11

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) .................................................. xxxvi, xxxvii, 2, 3

*Helm v. Kansas*, 656 F.3d 1277 (10th Cir. 2011) ..................... xxxviii, xl, xliii, xliv, xlvi, 4, 5, 6, 7

*Hutchinson v. City of Okla. City*, 919 F. Supp.2d 1163 (W.D. Okla. 2013) ...................... xxxvii, 3

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000) ................................. li, 9

*LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836 (1st Cir. 1993) ....................................................... li, 9

*Luster v. Vilsack*, 667 F.3d 1089 (10th Cir. 2011) ................................................................. lvii, 15

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ..................................................... l, 8, 9

*Meiners v. University of KS*, 359 F.3d 1222 (10th Cir. 2004) ................................................. lvi, 13

*Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164 (10th Cir. 2006) ............... lviii, 14

*Morris v. City of Colo. Springs*, 666 F.3d 654 (10th Cir. 2012)............................................ xxxvii, 3

*Pinkerton v. Colorado Dep't of Transp.,* 563 F.3d 1052 (10th Cir. 2009)liii, lv, lvii, lviii, 11, 12, 14

*Price Waterhouse v. Hopkins*, 490 U.S. 228.................................................................liii, lv, 11

*Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108 (10th Cir. 2007) .........................................lvii, 15

*Shaw v. AutoZone, Inc.*, 180 F.3d 806 (7th Cir. 1999) ........................................................ xliv, 6

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .............................................xlviii, li, 7, 8, 9

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ...........................xlix, li, 8, 9

*Timmerman v. U.S. Bank, N.A.,* 483 F.3d 1106 (10th Cir. 2007) ................................................li, 9

*Uragami v. Home Depot USA, Inc.*, 2005 WL 2177232 (D. Utah 2005)xl, xliii, lv, lvi, 4, 6, 13, 15

## STATUTES

Utah Code Ann. § 10-3-1105.......................................................................................... viii

## RULES

DUCivR 56-1 ............................................................................................................... vi

Fed. R. Civ. P. 56....................................................................................................... vi

Pursuant to [Rule 56 of the Federal Rules of Civil Procedure](#) and DUCivR 56-1, defendant Farmington City (the "City" or "Farmington") submits this Motion and supporting memorandum ("Motion") asking that summary judgment be granted in its favor on all causes of action pleaded by plaintiff Sarah Mojazza ("Ms. Mojazza").

## INTRODUCTION

Ms. Mojazza's Complaint paints a different picture than the facts—including her own words and the interviews she secretly recorded—reflect. Although no one disputes that her technical skills as a probationary firefighter were good, she was not terminated due to lacking technical skills or because she made a complaint of sexual harassment against a co-worker, Lindsay Workman. She was terminated by the City's Fire Chief Guido Smith because of her using the word f*** while on duty, in uniform, in public and in the presence of Farmington citizens, and because she showed her supervisor Captain Brian Thurgood and a co-worker firefighter Todd Smith ("FF Smith") a photo on her cellphone of a man with his genitalia exposed (the "photo"). FF Smith testified of the circumstances of her showing that photo to him, saying it was impromptu and that he felt Ms. Mojazza was bragging about this photo although she contended this man had raped her months before and later had sent the photo to her. That she earlier had shown the same photo to her immediate supervisor Captain Thurgood when informing him the man in the photo had raped her and allegedly asking Captain Thurgood for advice on handling the matter, does not diminish or change her inappropriate action. Ms. Mojazza also was counseled several times by Captain Thurgood and others about her use of improper language in the workplace—just as others would have been and actually were counseled—but it was her use of the word f*** in front of City citizens that caused her termination. There is no evidence of any other firefighter using that word in the presence of citizens public, and no evidence of anyone ever showing a sexually graphic photo to a co-worker

or anyone else.  At most, during a technical check of computers, one firefighter was found to have photos on his computer the City felt were improper and even pornographic.  That firefighter was immediately terminated without warning even though he was not probationary.  Nor had he shown any photos to others.

Moreover, although Ms. Mojazza contends she told Captain Thurgood on November 11, 2012 that Workman made her uncomfortable because of things Workman allegedly said and did, she admits she told Captain Thurgood at that time to do nothing.  He in turn told her to report anything else that happened.  Despite her present allegation of additional misconduct during November/December 2012, she said nothing more to Captain Thurgood until after she and Workman got into a shouting match using foul language on December 25, 2012 and only after she was confronted by Captain Thurgood about that.  At that point, Ms. Mojazza contends she reported Workman for alleged sexually harassing her.  She did this even though in the interim between her alleged November 11, 2012 report and the December 25, 2012 shouting match, she had invited Workman to come to her apartment where she was alone to look at some work related to installing a door.  She contends that while Workman was there, he told her she could pay him for the work with oral sex.  By contrast, he contends she showed him the bedroom and commented that it was where "f****** takes place" and then offered to pay him for the work with oral sex.  She cannot recall when this happened, and despite the difference in stories, what is undisputed is this incident did not occur in the workplace, and Workman immediately left her apartment and had nothing to do with her thereafter.

It also is significant that, at most, Ms. Mojazza and Workman worked together in December 2012 only on December 9, and that in a text message exchange in October/November 2012, they both made suggestive and inappropriate comments and that Workman ended that

"conversation" by saying he did not want to make her feel uncomfortable.  Ms. Mojazza admitted there were no texts between them after that November 2, 2012 text.  It also is significant that during Ms. Mojazza's exit interview with Fire Chief Guido Smith about eleven days after her termination, she raised Workman's alleged sexual harassment with Chief Smith but then refused to tell Chief Smith anything about it.  She also told Chief Smith in that interview that she had told Captains Thurgood and Love she did not want to pursue sexual harassment claims but that "now I would like to pursue it."  See Facts, *infra* at ¶ 118.  Indeed, she actually made a complaint to the City only after her exit interview.  When the City assigned Assistant City Manager Keith Johnson to investigate *only* the sexual harassment, he obtained the details of alleged harassment from Ms. Mojazza then interviewed others including Workman.  As a result of this investigation, Workman was terminated by City Manager Dave Millheim when Mr. Johnson's investigation concluded Workman's conduct was inappropriate and in violation of City policy.  Mr. Johnson had concluded it was a he said/she said situation with no witnesses, that some alleged incidents occurred outside the workplace, and that based on conduct as reported by Workman, Ms. Mojazza's conduct also was inappropriate.  Indeed, Mr. Millheim sent Ms. Mojazza a letter on February 5, 2013 reporting on the results of the investigation, and stated therein that he also would have terminated her based on her own inappropriate conduct toward/with Workman.

Ms. Mojazza began working for Farmington on September 13, 2012 as a probationary firefighter.  The probationary period was twelve months during which time the firefighter would be assessed on skills, and also would be subject to the City's and Farmington Fire Department's ("FFD") rules and regulations.  During this introductory period and perhaps thereafter, the State's merit employment system as set forth in Utah Code Ann. § 10-3-1105 would not apply to

Ms. Mojazza. This meant she was an at-will employee, which is irrelevant here except to the extent that the City knew it would not have provide her with the usual due process "notice and an opportunity to respond" before termination.

FFD consists almost exclusively of part-time employees. The only full-time employees were FFD's head, Chief Smith, and Captain Rich Love, who was Workman's supervisor. Ms. Mojazza's immediate supervisor, Captain Thurgood, was a part-time employee. Chief Smith had been hired in 2011 after the illness and later death of Farmington's then-Fire Chief Larry Gregory. Chief Smith is a proponent of hiring females and hired Ms. Mojazza shortly after she completed certification school, which school was not run by the City. Ms. Mojazza had come to the fire station and Chief Smith had counseled her there while she was still in certification school on what she should do to be hired by the City. Later, Chief Smith and Captains Brian Thurgood and Rich Love interviewed Ms. Mojazza for the job and she was hired. Workman began working for the City as a probationary firefighter at the same time as Ms. Mojazza.

When Ms. Mojazza and Workman began working for Farmington they received a copy of the City's Employee Handbook, which contains the City's sexual harassment policy. That policy includes information on who sexual harassment should be reported to and states an investigation will be made of complaints. Ms. Mojazza signed a statement that she received that handbook. Chief Smith also gave a PowerPoint presentation to every probationary employee which includes a section on sexual harassment, and evidence shows Ms. Mojazza received that training.

Ms. Mojazza was technically competent at the actual work involved in being a firefighter, and received very good reviews regarding her technical skills. She frequently worked with FF Todd Smith since Captain Thurgood worked only part-time, and was evaluated at times by full-time Captain Love. Captain Thurgood had cautioned Ms. Mojazza five to ten times before she

was terminated concerning her language in the firehouse and among co-workers including her use of the "f" word. FF Smith, who was not probationary, also cautioned Ms. Mojazza including about using the "f" word. Even Chief Smith cautioned her when she used the term "f***  buddies" to him to describe her male friends. She was never written up for these language lapses but was told it was improper and that she should watch what she said.

Ms. Mojazza and Workman worked together infrequently, and she admits they bantered back and forth in a "familiar" way. This is shown by a text message. FF Smith testified Ms. Mojazza frequently spoke in the workplace about sex.

Ms. Mojazza contends that during her November 11, 2012 evaluation she told Captain Thurgood that she was uncomfortable with Workman, but then told Captain Thurgood that she did not want anything done at that time. There is no evidence that anyone in the workplace ever saw anything related to Workman and Ms. Mojazza that appeared to be sexual, and Workman's and Ms. Mojazza's time records for December 2012 reflect that they worked at the same time one hour that month, on a call on December 9, 2012. Ms. Mojazza also admits she never complained about Workman from November 11, 2012 until about January 3, 2013. That January 3, 2013 complaint came on the heels of Ms. Mojazza's being spoken to by Captain Thurgood about a shouting altercation between her and Workman on December 25, 2012—which altercation had nothing to do with sex.

The altercation arose when Workman and Jed Done knocked loudly on the door of the bedroom where Ms. Mojazza was sleeping because a firefighter needed his uniform which was in that room. When Ms. Mojazza emerged from the bedroom she was angry and she and Workman began yelling at each other including using f***. Captain Thurgood learned of the altercation from Done and questioned Ms. Mojazza about it on about January 3, 2013. She

admitted that she and Workman were yelling at each other and acting inappropriately. It was only after that time that she now contends she told Captain Thurgood she *now* wanted to make a complaint about Workman's harassing her. Although the dates are confusing and no one seems to recall exact dates, it was about this same time that Captain Thurgood learned from FF Smith that Ms. Mojazza had used "f***" in the presence of Farmington citizens at a Farmington event called Bountiful Baskets, and that she had shown the photo to FF Smith. When these two incidents were reported to Chief Smith by Captain Thurgood, Chief Smith determined that Ms. Mojazza should be terminated for violating the Code of Ethics. Since Ms. Mojazza happened to be at the station that day, January 8, 2013, although not on duty, Chief Smith called her in and terminated her that same day. Workman was terminated on February 4, 2013, after Ms. Mojazza's exit interview, and after an investigation into his conduct.

Ms. Mojazza filed a Notice of Claim with the Utah Antidiscrimination Division, and later obtained a right to sue letter. She then timely filed this lawsuit, which states three causes of action all of which are under Title VII: (1) non-supervisor sexual harassment, (2) gender discrimination, (3) retaliation. These claims fail as a matter of law.

## STATEMENT OF FACTS

For purposes of summary judgment, the City accepts the following facts as true—in particular those alleged by Ms. Mojazza—but does not waive its right to dispute any of these facts at trial or in any other motion or court proceeding.

### A.     Background

1.     Guido Smith became Farmington Fire Chief on January 17, 2011. Guido Smith Depo., p. 12, relevant pages at Ex. 1. Prior to that he worked about twenty years at the Clinton Fire Department, including as deputy chief and interim chief when the Clinton Fire Chief retired. *Id.,* p. 13.

2.      Ms. Mojazza graduated from high school in April 2011, when she was seventeen, and from the University of Utah in May 2013.  Mojazza Depo., pp. 18, 29, relevant pages at Ex. 2.

3.      Because Chief Smith feels "I'm not exempt from our policies and expectations," in about November 2014 he "wrote himself up" when some equipment was damaged during a training he was conducting.  Guido Smith Depo., pp. 15-16.

4.      At the time Ms. Mojazza was employed by Farmington Fire Department ("FFD"), there were about 32 employees but only two were full-time—Chief Smith and Captain Rich Love.  Guido Smith Depo., pp. 18-19.  Everyone else was part time.  *Id.*, p. 19.

5.      FFD employees must sign an ethics statement, the Firefighter Code of Ethics. Guido Smith Depo., p. 21; Firefighter Code of Ethics, Ex 3.

**B.      Sexual Harassment Policy and Training**

6.      Chief Smith can recall at least three separate occasions when the City provided him with sexual harassment training.  Guido Smith Depo., p. 23.  The City also provided him with its handbook, which contains a sexual harassment policy, and he could ask questions about that.  *Id.,* pp. 23-24; *see also* Sexual Harassment Policy, Ex. 4.  He also received training on personnel policies and procedures in staff meetings.  Guido Smith Depo., pp. 24-25.  He received some of that training prior to Ms. Mojazza's termination.  *Id.,* pp. 25-29.

7.      Chief Smith provided training on sexual harassment to his "leadership group" at monthly officers meetings, *i.e.*, he trained captains and battalion chiefs.  Guido Smith Depo., p. 29.  Those trained included Captains Brian Thurgood and Richard Love.  *Id.,* p. 30.

8.      Chief Smith testified that he instructed his chain of command that "if they learned of instances of sexual harassment they were to take immediate action."  Guido Smith Depo., p.

32.  He testified that he believes this applies to a *complaint* of harassment, not just a comment about conduct.  *Id.,* p. 33.

9.     Chief Smith provides sexual harassment training to all new hires within eight weeks of their hiring date via a PowerPoint presentation.  Guido Smith Depo., pp. 30, 34; *see also* PowerPoint, relevant page, Ex. 5.

10.     Ms. Mojazza received PowerPoint sexual harassment training on November 27, 2012.  *See* FFD Probationary Firefighter 8 Week Performance Review (marked at Chief Presentation), Ex. 6; Guido Smith Depo., pp. 43-44.

11.     Other than Ms. Mojazza's, Chief Smith has never had a report of sexual harassment about the fire department while he has worked at the City.  Guido Smith Depo., p. 36.

12.     When Ms. Mojazza was hired, she received an employee handbook that contained a sexual harassment policy and signed a statement that she had received that handbook.  Mojazza Confirmation Receipt Handbook, Ex. 7.

13.     Ms. Mojazza testified that she attended a PowerPoint presentation by Chief Smith, but when asked about the sexual harassment portion of the presentation, said "I don't remember anything from his presentation."  Mojazza Depo., pp. 167-68.

14.     Captain Thurgood testified that he has received sexual harassment training through the City, and knows the City had a sexual harassment policy that includes a reporting policy.  Thurgood Depo., pp. 17-18., relevant pages attached as Ex. 8.

15.     Regarding the text message, Captain Thurgood testified that both parties agreed they were equally at fault.  Thurgood Depo., p. 23.

16.     Captain Thurgood testified that he never witnessed misconduct by Workman and Ms. Mojazza.  Thurgood Depo., p. 26.

17.     Captain Thurgood testified that alleged harassment was first brought to his attention by Ms. Mojazza after he had already received a report from Jed Done about a December 25, 2012 altercation where Ms. Mojazza and Workman had used inappropriate language.  Thurgood Depo., pp. 31-32.

18.     It was only after Captain Thurgood had counseled Ms. Mojazza about the altercation that she raised alleged sexual misconduct by Workman.  Thurgood Depo., p. 33.  This was the first time she actually complained about Workman to Captain Thurgood.  *Id.,* p. 35.

19.     Captain Thurgood testified Ms. Mojazza told him at that time that Workman came to her house to install a door, and that while there Workman told her she could pay for the work with oral sex and that he then reached down her shirt and touched her breasts.  Thurgood Depo., p. 36.

20.     Captain Thurgood testified Ms. Mojazza had also shown him a text which was on her phone, which was a conversation between her and Workman.  Thurgood Depo., p. 37; *see also* Text (entries 10/3012 through 11/2/12), Ex. 9.

21.     Captain Thurgood had been told by Ms. Mojazza that prior to working for the City she had been raped by someone she knew from her certification class and she showed him the photo of the man with his genitalia exposed, saying that the man had sent her the photo. Captain Thurgood testified that when she showed him the photo he said something like "Why in the world would you have that on your phone if this is the person that you allegedly said did this to you?"  Thurgood Depo., p. 60.  He testified that the context of her showing him this photo was just that she randomly pulled up the photo and showed it to him.  *Id.*, pp. 61-62.  He testified that

when Ms. Mojazza showed him the photo, she "definitely [was] not asking me for help." *Id.,* p. 63. He said "when she showed me the picture, it was more of a boasting, 'Hey, look at this. Check it out,'" and he thought it was inappropriate for her to show him the photo. *Id.*, pp. 64, 67.

## C. Ms. Mojazza's Testimony

22.  Ms. Mojazza testified that when she told Captain Thurgood about having been raped prior to working for Farmington, Captain Thurgood told her to report it. Mojazza Depo., p. 48. She said she then told Captain Thurgood the man had been bothering her and texting her, and when he asked what the man had sent her and she said "pictures," that Captain Thurgood asked to see those and that is when she showed him the photo. *Id.*, p. 48.

23.  Ms. Mojazza testified that on November 11, 2012, she had told Captain Thurgood that Workman was a "prob," in that "[h]e touches my butt in and out of the fire engine or on scene he's touched my butt, he grabs my boobs." Mojazza Depo., p. 49. She testified that when Captain Thurgood told her he could talk to Chief Smith about it, she told him not to do anything because "I'm going to try and continue to get [Workman] to stop and I will keep you updated." *Id.*, p. 50.

24.  Ms. Mojazza described in her deposition what Workman had done up to this November 11, 2012 point that she told Captain Thurgood: Workman had "grabbed my butt . . . and made, you know, a sexual sound. He had asked me to come to his house and have sex with him. He had touched my boobs." Mojazza Depo., pp. 50-51.

25.  Ms. Mojazza testified she doesn't remember whether she ever joined in sexual banter at work, but said that if she had it would have been in a small group that she knew she would not offend. Mojazza Depo., pp. 51-52. She said this would be her engine company. *Id.,* p. 62.

26.     Ms. Mojazza testified she had no problem with and was "fine with the general slander of women, yeah. I mean, it's the fire service. It's normal for me." Mojazza Depo., p. 53.

27.     Ms. Mojazza testified she was upset/offended when Chief Smith reported the rape to the police once he learned of it, and that she had told the police to just "drop it" (the rape complaint) because it was "too stressful for me." Mojazza Depo., pp. 54-55.

28.     Ms. Mojazza testified she met Chief Smith prior to being hired, while she was still in certification school, and that he was friendly to her, spoke to her, and gave her "pointers, tips" on being hired. Mojazza Depo., pp. 57-58. He told her to "get your advanced EMT, brush up on your fire skills," and advised her on interviewing with the City. *Id.* She testified those things were useful when she did interview with the City. *Id.*

29.     According to Ms. Mojazza, she was interviewed by Chief Smith and Captains Thurgood and Love, and then was hired at Farmington. Mojazza Depo., pp. 91-93.

30.     Ms. Mojazza testified that sometime in "November, December-ish" she moved to a basement apartment in Layton where she lived alone, and where her landlady lived upstairs. Mojazza Depo., pp. 67-68.

31.     Ms. Mojazza testified that when she was living in the Layton basement apartment—after she allegedly had told Captain Thurgood about Workman as she contends on November 11, 2012, but before January 3, 2013—she talked to her landlady about installing a door separating the upstairs and downstairs. Mojazza Depo., p. 98. The landlady told her to get a quote, and Ms. Mojazza invited Workman to come to her apartment to give her a quote. *Id.*, pp. 98-100. Ms. Mojazza was alone when Workman arrived. *Id.*, p. 99.

32.     Ms. Mojazza testified that, when Workman arrived at her Layton apartment, she could not remember whether she showed him her bedroom.  Mojazza Depo., p. 102.

33.     Ms. Mojazza testified that by the time she invited Workman to her apartment, she and Workman were friendly again:  "I felt like things were better.  Yeah, I felt like we were going in the right direction until that happened.  That was the—that was what happened for me to go tell Bryan, 'Look, I need you to take care of this.'"  She said "I felt like we had reached a point where, you know, the sexual stuff was behind us, you know, but dates, I can't remember."  Mojazza Depo., pp. 102-03.

34.     Ms. Mojazza testified that after she spoke to Captain Thurgood on November 11, 2012, she and Workman had not had much contact and "I had been more stern and said, you know, 'No, Lindsay, I don't want this.'"  Mojazza Depo., p. 103.  She testified "I can't remember" when asked whether anything happened between her and Workman between November 11, 2012, and the time when Workman came to her Layton apartment.  *Id.*, p. 103.

35.     When asked whether she had said to Workman about her bedroom when he was at her apartment that "That's where the f****** takes place," Ms. Mojazza said "I don't recall."  Mojazza Depo., p. 105.  She continued, "It's not something I—it's not something I think I would say."  *Id.*  When asked again where it is "possible you said it," she said again "I don't recall."  *Id.*

36.     Ms. Mojazza testified that after the incident at her apartment, she "avoided [Workman] as best I could."  Mojazza Depo., p. 107.

37.     Ms. Mojazza testified that she attended the City's Christmas party but does not remember whether she overheard anyone saying anything about her at that party.  Mojazza Depo., p. 110.  She said "I don't remember anything from that party other than I got a golf bag."  *Id.,* p. 111.

### D. Sexual Bantering/Conduct

38.     Chief Smith was aware from Captain Thurgood that Ms. Mojazza was uncomfortable with sexual bantering from Workman but that she had asked Captain Thurgood not to pursue it.  Guido Smith Depo., p. 68.

### E. Ms. Mojazza's Use of Profanity in the Workplace

39.     Chief Smith counseled Ms. Mojazza in late November-early December 2012 about a profanity she used in his presence.  Guido Smith Depo., p. 72.  He told her the statement she made—which was that her male friends were just "f*** buddies"— belittled her and that she needed to hold herself in higher regard.  *Id.*

40.     Chief Smith testified that when he heard other firefighters used f*** he counseled them about it and they then refrained from using the word.  Guido Smith Depo., p. 74.

41.     Captain Thurgood counseled Ms. Mojazza between five and ten times about her profanity in the workplace.  Thurgood Depo., pp. 51-52.  He counseled her about it at those times that made him "feel uncomfortable with what she said."  *Id.*, pp. 51-54.  He testified FF Todd Smith had complained to him about Ms. Mojazza's language.  *Id.*, pp. 55-56.

### F. The Altercation

42.     Ms. Mojazza testified that on Christmas Eve or Christmas Day she was asleep in a bedroom of the fire house with the door closed, when Captain Jed Done and Workman "came pounding on my door and yelling."  Mojazza Depo., pp. 114-15.  She testified that both Done and Workman yelled at her and there was "a lot of swearing."  *Id.,* p. 115.  She said Workman used the f-word but she did not, and that all she said was "Leave me the hell alone."  *Id.,* p. 115.  When asked whether someone would be wrong if they alleged she used "f" words during the altercation, she responded "I don't know.  That's all I can remember."  *Id.,* p. 115.  She agrees

they were yelling at each other.  *Id.,* pp. 116-17.  She felt there was no reason for them to pound on her door.  *Id.,* p. 116.

43.     Ms. Mojazza testified that Captain Thurgood was walking by her a few days after the altercation and said to her, "Hey, I heard something happened with you and Jed and Lindsay. What happened."  Mojazza Depo., p. 117.  She told him what happened and "he just said, 'Okay. Thanks.'"  *Id.*  She testified that she did not call a meeting with him.  *Id.*, pp. 117-18.  She testified this was the only time she met with him about the altercation.  *Id.*, p. 118.

44.     Chief Smith was aware from Captain Thurgood and Captain Love that there had been an altercation between Workman and Ms. Mojazza.  Guido Smith Depo., p. 68.  He told Captains Thurgood and Love to talk to Workman and Ms. Mojazza about the altercation and to issue verbal discipline.  *Id.,* pp. 70-71.

**G.     Workman's Testimony and Statement**

45.     Workman testified that the altercation started when he and Captain Jed Done began knocking on the door of the room where Ms. Mojazza was asleep.  Lindsay Workman Depo., p. 20, relevant pages attached as Ex. 10.  They knocked because "one of the guys had his uniform in that room and he needed to get into uniform."  *Id.*  Ms. Mojazza came out of the room and she and Workman began yelling at each other.  *Id.,* pp. 20-21.  Workman told his captain, Rich Love, about the argument.  *Id.,* p. 22.

46.     Workman admitted to Captains Thurgood and Love when they talked to him about the altercation and Ms. Mojazza's allegations, that he had sent the text messages. Workman Depo., pp. 23-25.

47.     Workman testified he had been counseled to watch his language in the workplace. Workman Depo., p. 15.

48.     Workman contends he never touched Ms. Mojazza inappropriately.  Workman Depo., pp. 28-30.  He contends that when he went to her home at her invitation to see about installing a door, she said to him that she could pay him with oral sex.  *Id.,* p. 30.

49.     Workman testified that he and Ms. Mojazza joked around all the time, and that the first time she told him it was inappropriate was in the text.  Workman Depo., pp. 30-31.  This was November 2, 2012.  *See* Text, Ex. 9.

50.     Workman testified that he thinks he crossed the line on inappropriate conduct, and that Ms. Mojazza also did.  Workman Depo., p. 41.  He thought Ms. Mojazza also crossed the line with others with her profanity, and with her discussing her sex life including those she had had sex with.  *Id.*, p. 41.  He testified "she had no filter."  *Id.*, p. 57.  He testified people who had been in Ms. Mojazza's certification class talked to him about her and that he was told by one person in her class that after class she would say "'Okay, who is up for a b*** j**.'"  *Id.*, p. 43.

51.     Workman testified he never asked Ms. Mojazza to come to his house and have sex with him, and that he is married with three children and a homemaker wife.  Workman Depo., pp. 51-52.

52.     Workman testified that when he went to Ms. Mojazza's house about installing the door, she showed him around the apartment and when they reached the bedroom she said to him, "This is where all the f****** goes on.'"  Workman Depo., pp. 52-53.

53.     Workman testified that after Ms. Mojazza told him she would pay him for work on the door with oral sex, he poked her with his finger right above her shirt line and said "you're a tease" and then left.  Workman Depo., p. 53.  He contends he did not touch her breast.  *Id.*  He testified he avoided being alone with Ms. Mojazza after that time.  *Id.*

54.     Workman met with Keith Johnson during the sexual harassment investigation and talked to Mr. Johnson about his relationship with Ms. Mojazza.  Workman Depo., p. 56; *see also* Summary of Workman Comments to Johnson in Sexual Harassment Investigation, Ex. 11.

**H.     Mojazza Talks to Thurgood**

55.     Ms. Mojazza testified that she was not on duty on January 3, 2013, but had come to the fire station for a couple of calls.  Mojazza Depo., p. 121.  She contends she met with Captain Thurgood at a kitchen table in the fire station kitchen, and that Captain Thurgood asked FF Todd Smith to join them.  *Id.*, pp. 121-22.  She claims she said at that time, "Bryan, I can't do this anymore.  Lindsay's taking it too far."  *Id.*, p. 123.  She contends she had told Captain Thurgood "a few days before about the incident at my house" and that Workman "was texting me and calling me."  She said Captain Thurgood had wanted FF Todd Smith to "step in" into the kitchen with them and had said to her "Well, let's catch Todd up."  *Id.*  She contends Captain Thurgood then told her what to tell FF Smith:  "Start with [the man in the photo].  Tell him everything about [the man in the photo]."  *Id.*, p. 125.  Ms. Mojazza contends he told her to "show [Todd] the photo" and then to tell FF Smith about Workman.  *Id.*, p. 125.

56.     Ms. Mojazza testified "I don't remember" when asked whether Workman had done anything sexually inappropriate between the time of the incident at her apartment and January 3, 2013.  Mojazza Depo., p. 128.  Time records show that the time Workman and Mojazza worked the same shift/call in December 2012 was December 9, 2012, when both their time sheets reflect one-hour for Call No. 820.  The only other time was a potential time of shift "overlap"—Ms. Mojazza worked from 7 am on December 24, 2012 until 5 pm on December 25, 2012, and Workman worked from 5 pm on December 25, 2012 until 7 am on December 26, 2012.  *Compare* Mojazza Time Records 12/12, Ex. 12 *to* Workman Time Record (12/12), Ex. 13.

## I.     Text Message

57.     Ms. Mojazza testified that she and Workman texted each other, and that the only text that was offensive to her is the one that she printed out.  Mojazza Depo., p. 147; *see* Text, Ex. 9.

58.     Ms. Mojazza felt Workman was offensive when she texted him that "I'm about to steal the flashlight in your box," to which Workman had responded "You can have it for something."  Mojazza Depo., p. 147.

59.     Ms. Mojazza felt it was offensive when Workman texted "Do you have a nurse outfit."  Mojazza Depo., p. 149.  She had responded to that question with "yes" and "LOL" (laugh out loud).  *Id.*

60.     Ms. Mojazza testified she was offended when she texted Workman that she was "running my ass off," to which Workman had responded "Be careful…not much there to run off" and "Not that I've looked."  Mojazza Depo., p. 149.  She then had responded to this by texting, "Are you saying I don't have an ass."  *Id.*, p. 150.

61.     The text ends with Workman telling Mojazza he does not want her to feel uncomfortable:

> Workman:  How's your ass HaHa.  Why don't you ever answer me when I bring up stuff like ur ass and nurses uniforms?
>
> Mojazza:  Nope.
>
> Workman:  Nope what?
>
> Mojazza:  Cause it's weird.
>
> Workman:  Why is it weird?  If it's weird I won't do it any more.  Talk to me.
>
> Mojazza:  IDK  it was fun for awhile but you have a wife and all
>
> Workman:  Oooookkk.
>
> Mojazza:  Why.  I mean what.

Workman:  Nothin.  Just don't want u to feel uncomfortable or anything.

*See* Text, Ex.  9.

62.      Ms. Mojazza testified this November 2, 2012 text was the last text she and

Workman ever exchanged.  Mojazza Depo., pp. 152-53.

**J.      Work Clothing for Ms. Mojazza**

63.      As part of her gender discrimination claim, Ms. Mojazza apparently alleges she

was denied work clothes by Chief Smith and that it took him two to three months to obtain

clothing for her.  Mojazza Depo., pp. 156-157.  Her complaint is that her gear did not fit her (in

particular, a t-shirt with FFD emblem), not that she did not receive any gear.  *Id.,* pp. 158-59.

64.      There is no evidence Chief Smith ever excluded Ms. Mojazza from clothing

orders.  *See* Clothing Order & E-Mails, Ex. 14; Mojazza Depo., pp. 160-65.

**K.      Ms. Mojazza's Termination**

65.      On January 8, 2013, Captain Thurgood recommended to Chief Smith that Ms.

Mojazza be terminated because she did not meet what is expected of a probationary firefighter,

*i.e.*, core values and ethics.  Thurgood Depo., p. 7.  He stated this was due to her inappropriate

language and her showing a sexually explicit photo to Captain Thurgood and "others."  *Id.*

66.      Captain Thurgood testified that "a series of events [] led to [his] meeting" with

Chief Smith.  Thurgood Depo., p. 8.  He testified FF Todd Smith had told him Ms. Mojazza had

used inappropriate language during a Bountiful Baskets event, *i.e.,* that she said "it's f******

cold outside" in the presence of Farmington citizens.  *Id.,* pp. 9-10.

67.      Captain Thurgood testified he had "counseled" Ms. Mojazza "numerous times"

about her language.  Thurgood Depo., p. 10.  He testified Captain Jed Done also told him Ms.

Mojazza "used inappropriate language in the public."  *Id.,* p. 9.

68.     Chief Smith testified that he terminated Ms. Mojazza because of two incidents: (a) her using f*** while on duty, in uniform, and in the presence of Farmington citizens; (b) showing a graphic photo on her cellphone of a man displaying his genitalia.  *See* Trans. Exit Interview, Ex. 15.

69.     Captain Thurgood informed Chief Smith of Ms. Mojazza's using f*** in the presence of Farmington citizens while she and they were at a weekly Saturday Bountiful Baskets grocery co-op sponsored by the City, and Chief Smith terminated her that same day.  Guido Smith Depo., pp. 74-76.  That was the first that Chief Smith had heard of this incident.  *Id.,* p. 77.

70.     When Chief Smith was terminating Ms. Mojazza she had told him that she "had other complaints, but wouldn't tell [him] details."  Guido Smith Depo., p. 90.

71.     Chief Smith testified that at the time her terminated Ms. Mojazza, he had not been made aware from Ms. Mojazza of any details about "texting and harassment."  Guido Smith Depo., p. 83.

72.     Chief Smith testified that it was during the later exit interview that he first knew Ms. Mojazza was complaining of "harassment."  Guido Smith Depo., pp. 82-83, 97.  At the time of termination he knew about the altercation, that Workman and Ms. Mojazza were swearing at each other, and that neither wanted to pursue it.  Guido Smith Depo., p. 83.  He suspected she might be claiming harassment but had no documentation and understood that when Ms. Mojazza had talked to Captains Thurgood and Love it was not "a complaint" and that she had requested they not pursue it.  Guido Smith Depo., pp. 84-85.

73.     Chief Smith testified that he "confronted" Ms. Mojazza with her use of f*** in the presence of Farmington citizens, and her showing the photo.  Guido Smith Depo., p. 99.  He testified that to him the photo was the "number one out of the two."  *Id.,* p. 101.

74.     Ms. Mojazza admitted to Chief Smith that she had shown the photo to Captain Thurgood.  Guido Smith Depo. p. 103.  Chief Smith testified Ms. Mojazza "was questioned about the image" in the termination meeting "and she did not deny it."  *Id.*, p. 116.

75.     Chief Smith testified that when Captain Thurgood told him about the photo, Captain Thurgood explained the photo was of a fire department member from another City "with his penis exposed."  Guido Smith Depo., p. 105.

76.     Captain Thurgood told Chief Smith that the photo had "disturbed him, caused him concern and he felt that the other firefighter that he was aware that was showing [sic] it was uncomfortable with it as well."  Guido Smith Depo., pp. 105-06.  Chief Smith stated Captain Thurgood told him Ms. Mojazza made "a statement . . . in reference to the size of the gentleman's penis and that it surprised Captain Thurgood that someone who was supposedly assaulted or raped by this individual, that they would carry that picture around with them and show it off in that manner more as a trophy—and that was my interpretation of the conversation."  *Id.*, p. 106.

77.     Chief Smith stated the circumstances of Ms. Mojazza showing the photo were "irrelevant.  She showed an inappropriate image in the workplace setting."  Guido Smith Depo., p. 106.

78.     Ms. Mojazza had said she was raped by the man in the photo.  Guido Smith Depo., p. 108-09.

79.     Chief Smith testified that he also was told Ms. Mojazza had shown the photo to FF Todd Smith, stating "[f]rom what I was able to ascertain, [Todd] was there working on a computer [at work] and Mojazza went over to him and showed him the picture."  Guido Smith Depo., p. 110.

80.     Chief Smith testified that by showing the photo Ms. Mojazza "violated a core [*sic*] of ethics of the firefighter agreement she had signed." Guido Smith Depo., p. 111. That "code" of ethics, signed by Ms. Mojazza, instructs that the firefighter will "Responsibly us[e] social networking, electronic communications, or other media technology in a manner that do[es] not discredit, dishonor, or embarrass my organization, the fire service and the public." *Id.,* pp. 111-12 (quoting Code of Ethics); *see* Firefighter Code of Ethics, Ex. 16 (signed by Mojazza).

81.     On January 9, 2013, on the day after Ms. Mojazza's termination, Chief Smith sent an email follow-up to City Manager Dave Millheim regarding "Release of Probationary Firefighter – Sarah Mojazza." *See* Smith Email to Millheim (Jan. 9, 2013), Ex. 17.

### L.     Brian Thurgood Testimony

82.     Captain Thurgood testified that the first time he heard from Ms. Mojazza that she felt she was being harassed or that there was "workplace misconduct" was after he talked to her about the December altercation. Thurgood Depo., pp. 14-15.

83.     Captain Thurgood provided a statement to Chief Smith about Ms. Mojazza's showing him the photo on her cellphone. *See* Thurgood Stmt. to Smith, Ex. 18.

84.     Captain Thurgood provided a statement to Chief Smith about the exit interview. Thurgood Stmt. Re Exit Interview, Ex. 19.

85.     Captain Thurgood provided a statement to Chief Smith regarding the altercation, and that neither Workman nor Ms. Mojazza wanted it to go any further. Thurgood Stmt. Re Altercation, Ex. 20.

### M.     Todd Smith Statement and Testimony

86.     FF Smith provided a statement concerning his being with Ms. Mojazza at a Saturday Bountiful Baskets event where she used the word f**** in the presence of Farmington citizens. *See* Smith Stmt., Ex. 21.

87.     FF Smith provided a statement detailing Ms. Mojazza's showing him the sexually explicit photo while he was working on the computer at work.  Smith Stmt., Ex. 21.

88.     FF Smith testified that some time prior to Ms. Mojazza's showing him the photo, she had told him that she had been raped.  Todd Smith Depo., p. 31, relevant pages attached as Ex. 22.

89.     Todd Smith testified that when Ms. Mojazza showed him the photo she said, "'Hey, I want to show you something, 'and then she showed me that picture'" and said "This is the person who raped me."  Todd Smith Depo., p. 33.  He testified that he said, "Wow" because he was surprised that the man was in a firefighter's uniform and that the man sent or gave the photo to Ms. Mojazza.  *Id.*  Ms. Mojazza then said to Todd Smith.  "Look at him and look how big he is.  Look at how big his . . .."  and then said "Look, you can see that."  *Id.*

90.     Todd Smith testified that after Ms. Mojazza showed him the photo he reported it to Captain Thurgood, "And then my statements came shortly after that time frame."  Todd Smith Depo., p. 33.

91.     Todd Smith confirmed the photo as the one Ms. Mojazza showed him.  *See* Todd Smith Depo., pp. 33-34; *see also* Photo, Ex. 23 (filed separately under seal).

92.     Todd Smith testified that he included in his statement that he felt Ms. Mojazza "was happy with the picture and proud of it, and not sad or angry at the individual she said raped her in that picture."  Todd Smith Depo., p. 34; Todd Smith Stmt., Ex. 21.  He testified about this that "I felt like when she showed it to me, she was—it was she was bragging about him or who she had been with that she kept this picture, I don't know, again as a treasure or something.  I—honestly, I don't know."  Todd Smith Depo., p. 34.

93.     Todd Smith testified that his statement was made to document what he had told to Captain Thurgood that he had "seen and heard from Sarah." *See* Todd Smith Depo., p. 11.

94.     Todd Smith testified that he and Ms. Mojazza "worked a lot together and almost kind of exclusively together.  Me and her and Bryan Thurgood worked a lot of shifts together." Todd Smith Depo., p. 7.

95.     Todd Smith testified that Workman told him that one time he and Ms. Mojazza were "pulling hose" and that Ms. Mojazza was lying on the ground dragging the hose and Workman was standing near her when she said to Workman "Is this how big you like it?"  Todd Smith Depo., pp. 8-9.

96.     Todd Smith testified that he told Captain Thurman that Ms. Mojazza used f*** in the presence of Farmington Citizens.  Todd Smith Depo., pp. 23-24.  He testified that Ms. Mojazza "is the only person in the fire department he has ever heard use f*** in a "public setting." *Id.,* p. 24.

97.     Todd Smith testified he has never heard any fire department employee use a swear word in a public setting except for Ms. Mojazza.  Todd Smith Depo., pp. 24, 42. Explaining why firefighters did not use swear words in public, he said "You're told not to and you don't do that." *Id.,* p. 24.

98.     Todd Smith testified that no citizen complained to him about Ms. Mojazza's using f***.  Todd Smith Depo., p. 26.

99.     Todd Smith testified that he heard Captain Thurgood "discuss[] [Ms. Mojazza's language with her several times."  Todd Smith Depo., pp. 26-27.

100.    Todd Smith testified that except for Ms. Mojazza, he never heard a probationary employee use profanity in the workplace.  Todd Smith Depo., p. 27.

101.     Todd Smith testified that Workman told him Workman and Ms. Mojazza "had inappropriate conversations back and forth with each other." Todd Smith Depo., p. 9.

102.     Todd Smith testified he had received sexual harassment training. Todd Smith Depo., p. 37.

**N.     Exit Interview**

103.     An exit interview for Ms. Mojazza was held on or about January 19, 2013, and Ms. Mojazza surreptitiously recorded it and produced the disk during discovery. The City had that disk transcribed by a certified court reporter. *See* Trans. Exit Interview, Ex. 15. Ms. Mojazza, Chief Smith, Captain Thurgood, and a female employee to take notes were in that interview. *Id.*

104.     At the beginning of the interview, Chief Smith asked Ms. Mojazza whether she had brought her "list of things, because you identified [during the termination] there were some things here that I needed to be aware of that weren't fair—or at that time that you felt weren't fair." Trans. Exit Interview, pp. 2-3. Ms. Mojazza stated she had not made a list. *Id., p. 3.* He asked her whether she would still like to "address some of the concerns that you have," and she responded "Can I get back to you on that later?" *Id.* He asked whether she wanted to postpone the exit interview until that time, and she did not. *Id.*

105.     In the exit interview, Chief Smith told Ms. Mojazza she was terminated for her comment in the presence of the public at the Bountiful Baskets event, and for showing the photo. Trans. Exit Interview, pp. 4-5.

106.     Chief Smith told Ms. Mojazza regarding her using f*** in the public's presence that, "So, with that alone, that was very disappointing for me, as the chief, that I've gone out of my way to get you on board. As we—as I first hired you, I told you I knew there was some history from when you were younger here, but I was giving you the opportunity as an adult, and

the language got you into trouble. Do you understand that?" Trans. Exit Interview, p. 4. She responded "yes." *Id.*

107.    Ms. Mojazza admitted she showed the photo to Captain Thurgood and FF Todd Smith. Trans. Exit Interview, pp. 4-5. She stated she showed the photo to them because it was a picture of "a guy who raped me. That was in confidence in an effort to seek advice on how to proceed with that situation in attempts to keep my crew in check." Trans. Exit Interview, p. 5. She stated the rape incident occurred "prior to my employment here" and told Chief Smith she did not want "to report [the rape] at this time." *Id,* p. 6. Chief Smith told her that due to his position, he had to report the rape. *Id.,* pp. 6-7.

108.    Chief Smith reported the rape to Farmington Police Chief, Wayne Hansen, who reported it to the district attorney. Guido Smith Depo., pp. 10-11.

109.    Ms. Mojazza asked Chief Smith to keep the rape confidential and he said he would: "It is strictly confidential. Whatever you tell people—and it sounds like you've been letting individuals know about this. Obviously we're not accountable for that." Trans. Exit Interview, p. 8.

110.    Chief Smith told Ms. Mojazza that his concern was not the sexual assault or her telling Captain Thurgood about it. Trans. Exit Interview, p. 9. The problem was her showing the "inappropriate pictures and, unfortunately, regardless of the reason, that was a really bad choice on your behalf, and I'm sure you can understand there would be plenty of speculation why you had that picture on your phone." Trans. Exit Interview, p. 9. Ms. Mojazza responded "I have been keeping it for when I'm ready to report the rape." *Id.*

111.     Ms. Mojazza told Chief Smith "I was not on duty at the time that I showed this picture." Trans. Exit Interview, p. 9.  Chief Smith responded, "It doesn't matter.  You were on the premises and you showed it to another employee." *Id.,* pp. 9-10.

112.     Ms. Mojazza alleged that either FF Chris Winter or FF Jason Hastings had used f*** when in the ready room.  Trans. Exit Interview, pp. 11-12.  She claimed others had said "many of those words" in public, pointing to Workman and "Brandon (inaudible)." *Id.,* pp. 12-13.  Chief Smith stated he was making notes of what she was saying to him but "it would have been nicer if you'd had a list for us.  It makes it a lot easier for us to follow up on." *Id.*  He told her he wanted all allegations, even if they were about him, "in a statement turned into the department so we can follow up on it and my superiors can follow up on it." *Id.,* p. 13.

113.     Regarding the photo, Chief Smith said to Ms. Mojazza, "There's absolutely no excuse—and I'll be honest with you.  I'm disappointed.  As the fire chief that's gone out of his way to bring women into this organization—because I believe women can do just as good a job as men.  You have the knowledge.  You have the skill capacity.  For a second have you thought, by showing those pictures or by any of your behavior, that it would make the rest of the staff or their spouses feel uncomfortable in working here with you one on one?  Did you give that a thought?" Trans. Exit Interview, pp. 13-14.  Ms. Mojazza said yes, and that she felt she was discriminated against as a woman in that men do things that "just slip through the cracks." *Id.,* p. 14.

114.     Ms. Mojazza asked why—since she showed the photo to Captain Thurgood "approximately three months ago, four months ago" —she was being terminated "one month away from my probationary period ending." Trans. Exit Interview, pp. 14-15.  Chief Smith

stated, "Because, as the fire chief, I wasn't aware of it. . . . The same day I let you go is the day that I found out." *Id.,* p. 15.

115.    Ms. Mojazza stated that the matters she was concerned about were "reported promptly" to Captain Thurgood "and those were taken care of." Trans. Exit Interview, p. 15.

116.    Ms. Mojazza stated she did not think things other "leadership" saw was taken care of. Trans. Exit Interview, pp. 15-16. After this statement by Ms. Mojazza, Captain Thurgood spoke up in the exit interview and said they had addressed things. Trans. Exit Interview, p. 18. Ms. Mojazza claimed these things were "visible" to Chief Smith, and he responded, "you know what? And I am willing to call you on that, because I am very, very careful on to what degrees jokes go or are said. . . . Don't get into a position right now where you start coming out with accusations that you can't back. That's why I need a statement." *Id.,* pp. 18-19.

117.    Toward the end of the exit interview, Ms. Mojazza asked "What is the status of my sexual harassment claim against Lindsay Workman?" Trans. Exit Interview, p. 20. Chief Smith responded, "There—one, there's no official sexual harassment claim. We do have statements from both captains that addressed it, as they were ordered to do so by me at our officers meeting to follow up and find out what—because there was supposedly an altercation between the two of you. You're starting to use some words that concern me, and I would be careful how you pursue the wording on that, because we can stop this and we can say, 'We're not going to have any more discussion until our legal representation is here and yours is,' so be careful on the words that you're choosing." *Id.* He asked Ms. Mojazza, "Did you claim a formal sexual harassment charge against Lindsay Workman? Yes or no?" Ms. Mojazza said, "yes." Chief Smith then stated that he wanted to end the interview "because I have not, as the

fire chief, been made aware of a formal sexual harassment. And by doing so and claiming so, you're entering in a whole new field." *Id.,* pp. 20-21.

118.    Chief Smith then stated that he had statements from captains that neither Workman nor Ms. Mojazza wanted to pursue it further. Trans. Exit Interview, p. 22. He asked her point blank whether she told the supervisors she did not want to pursue it, and she responded, "Yes. I did not want to pursue that at the time." Trans. Exit Interview, p. 22. She then said "And now I would like to pursue it." *Id.*

119.    Ms. Mojazza told Chief Smith that Workman "has asked me to come to his house and have sex with him." Trans. Exit Interview, p. 24. He asked her to write up two statements for him, one on why she felt discriminated against and "the other pertaining to sexual harassment with Lindsay Workman." *Id.*, pp. 24-25.

120.    Ms. Mojazza told Captain Thurgood in the exit interview, "Captain, you have been a very good example. You have taught me a lot and are one of the only people I trust on this fire department." Trans. Exit Interview, p. 25.

121.    When Ms. Mojazza was asked by Chief Smith what kind of bad example to her he had been, she referred to his making jokes about her pet dog and about eating that dog for lunch. Trans. Exit Interview, p. 27. When stating this in the interview she then said "please don't laugh." *Id.* She later admitted in her deposition that she may have been laughing in the exit interview herself when she brought up her dog. Mojazza Depo., p. 130-31. She testified that she thought it was "vulgar" for him to talk about her dog and that Chief Smith had come out of Rich Love's office and "said something to the effect of, 'It's lunchtime. We should just cook Sarah's dog up for lunch.'" *Id.,* p. 132. She told Chief Smith he was rude. *Id.* She said another time he said something to the effect that "This would go great with some Chihuahua." *Id.,* p. 133.

122.     When Chief Smith asked Ms. Mojazza, "were you counseled—yes or no—on language?" she responded, "Not formally," by which she meant there was never anything in writing.  Trans. Exit Interview, p. 28.

123.     Ms. Mojazza testified she cannot recall whether anyone ever cautioned her about her language.  Mojazza Depo., pp. 135-36.  She then denied Captain Thurgood had ever cautioned her about her language.  *Id,,* p. 136.  She denied Captain Love or Chief Smith ever cautioned her about her language.  *Id.*, pp. 136-37.

124.     Ms. Mojazza testified that she cannot recall whether she ever said f*** at Bountiful Baskets while citizens were present, but "I don't think so."  Mojazza Depo., p. 138.

125.     Ms. Mojazza testified she never used the word f*** at work at the City.  Mojazza Depo., pp. 139-40.

**O.     Sexual Harassment Investigation**

126.     Ms. Mojazza went to Assistant City Manager Keith Johnson on January 22, 2013, and made a sexual harassment complaint about Workman, which Johnson then was assigned to investigate.  *See* Sexual Harassment Report & Interviews, Ex. 24, at Bates FC0096.

127.     For the investigation, Mr. Johnson interviewed Ms. Mojazza on or about January 26, 2013.  *See* Trans. Mojazza Interview, Ex. 25.  Ms. Mojazza secretly recorded that interview and provided a disk to the City in discovery.  The City had it transcribed by a certified court reporter.  *See id.*

128.     Ms. Mojazza told Mr. Johnson in the investigation that she was not uncomfortable with inappropriate words, comments, etc,, "until it got personal" and where it applied to her.  Trans. Mojazza Interview, p. 7.

129.     Ms. Mojazza told Mr. Johnson that the door incident occurred sometime in December 2012.  Trans. Mojazza Interview, p. 11.

130.     Mr. Johnson interviewed Chief Smith, Captain Thurgood, Captain Rich Love and Workman.  *See* Sexual Harassment Report & Interviews, Bates at FC0097-103.

131.     After obtaining statements and interviewing, Mr. Johnson provided a Report on his sexual harassment investigation to Dave Millheim, Farmington City Manager.  *See* Sexual Harassment Report & Interviews, Ex. 24.

132.     Mr. Johnson's findings in the Report were that there were things going on between Ms. Mojazza and Workman, that they both made sexual statements, and that she was exaggerating and he was not coming forward with everything, that he believed Workman about the incident at Ms. Mojazza's apartment, and that Ms. Mojazza "creat[ed] an open provocative environment in her talking about her sex life, joking sexually, and foul language which [Workman] went along with was part of the joking and bantering and seemed to fuel it himself with her."  *See* Sexual Harassment Report & Interview, at Bates FC0095.

133.     Mr. Johnson noted that Ms. Mojazza had had an opportunity in the exit interview to "come forward with Guido Smith" with all her accusations "[b]ut she never did bring forth anything at that time."  Sexual Harassment Report & Interview, at Bates FC0095.

**P.      Termination of Workman**

134.     As a result of the investigation, the City terminated Workman on February 4, 2013.  *See* Personnel Action Form, Ex. 26.

**Q.      Notice to Mojazza of Investigation Result**

135.     On February 5, 2013, City Manager Millheim sent a letter to Ms. Mojazza informing her that disciplinary action was being taken as a result of her allegations of sexual harassment.  *See* Millheim Letter to Mojazza, Ex. 27.  The letter also informed Ms. Mojazza that "It has further been determined that your actions, on some occasions, were also in violation of

the Farmington City sexual harassment policy.  Your actions which were in violation of the City policy included the repeated use of sexual language and innuendo while at the work place."  *Id.*

<u>**STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS**</u>

Although there are no "elements" *per* se in Title VII claims, the City submits the following Statement of Elements and Undisputed Material Facts.  On summary judgment on Title VII claims, there are only shifting burdens including a "burden of production" and not proof for employers, various definitions, and various defenses that are available and on which the Court can rule as a matter of law.  Those burdens, definitions, and defenses that the City believes to be applicable in this case are detailed below.

**I.      TITLE VII CO-WORKER SEXUAL HARASSMENT CLAIM.**

      **A.      Burdens of Proof For Harassment By Non-Supervisor**

To prove sexual harassment  by a non-supervisory co-worker under a negligence theory the employee must establish (1) the employer had actual or constructive knowledge of the harassment and (2) the employer's remedial and preventive responses to the harassment were inadequate.  *Dunlap v. Spec Pro, Inc.*, 939 F.Supp.2d 1075, 1085 (D. Colo. 2013) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998)).

      **B.      No Constructive Knowledge For Prima Facie Case.**

a.      "Constructive knowledge may be inferred when the harassment is 'highly pervasive' and should, in the exercise of reasonable care, have been discovered by management-level employees."  *Dunlap v. Spec Pro, Inc.*, 939 F.Supp.2d 1075, 1085 (D. Colo. 2013).

b.      "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

c.   The environment must be both objectively and subjectively offensive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). A court should look at the "frequency of the discriminatory conduct; its severity; whether it is psychologically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 22.

d.   "[M]ere utterances of an . . . epithet which engenders offensive feelings in an employee" does not amount to an abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

e.   "'[T]he run of the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.'" *Hutchinson v. City of Okla. City*, 919 F. Supp.2d 1163, 1174 (W.D. Okla. 2013) (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)).

**Relevant Undisputed Facts.**

1.   No evidence of hostile work environment being created by Workman.

2.   No evidence of anyone viewing or seeing what Ms. Mojazza alleges. She and Workman were alone at her home where she had invited him. Facts ¶¶ 30-36 (Mojazza Depo., pp. 67-68, 98-99, 102-03, 105-07).

3.   The "basement incident" took place in Ms. Mojazza's apartment, outside the workplace. Facts ¶¶ 30-36 (Mojazza Depo., pp. 67-68, 98-99, 102-03, 105-07).

4.   Incidents as alleged by Ms. Mojazza did not occur in December, and appeared to end by her testimony by the time of the basement incident. Facts ¶¶ 33-34 (Mojazza Depo., pp. 102-103).

5.      Ms. Mojazza testified the November 2, 2012 text is the last one she had from

Workman, and in that he had concluded that by saying he did not want her to feel

uncomfortable.  Facts ¶¶ 61-62 (Mojazza Depo., pp. 152-53; Text, Ex. 9).

**C.      No Actual Knowledge Shown.**

a.      "[A]ctual knowledge is established where the plaintiff reported harassment to a

management-level employee."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673

(10th Cir. 1998).  A vague complaint is not "proper notice."  *Helm v. Kansas*, 656

F.3d 1277, 1291 (10th Cir. 2011).

**Relevant Undisputed Facts**

1.      Ms. Mojazza did not report sexual harassment and want something done about it

until the exit interview, conducted on or about January 19, 2013—after her

termination.  She raised sexual harassment by Workman when the interview was

near the end.  Chief Smith stated he had statements after the altercation from

Captains Thurgood and Love that she did not want to pursue it, and he asked her

point blank whether she told these supervisors she did not want to pursue it and

she responded, "Yes, I did not want to pursue that at that time."  Facts ¶ 117

(Trans. Exit Interview, pp. 22-23).  She then said, "[a]nd now I would like to

pursue it."  Trans. Exit Interview, p. 23.  Chief Smith then asked Ms. Mojazza to

write up a statement "pertaining to sexual harassment with Lindsay Workman."

(*Id.,* pp. 24-25).

2.      Ms. Mojazza admits she told Captain Thurgood on November 3, 2012 that she did

not want to make a sexual harassment complaint against Workman, and that she

told Captain Thurgood this because "I'm going to try and continue to get

[Workman] to stop and will keep you updated." Facts ¶ 22 (Mojazza Depo., p. 49).

3.  Keith Johnson conducted an investigation into Ms. Mojazza's sexual harassment complaint against Workman. *See* Sexual Harassment Report & Interviews, Ex. 24. He interviewed Ms. Mojazza on or about January 26, 2013. *See* Trans. Mojazza Interview, Ex. 25.

4.  Ms. Mojazza went to Captain Thurgood about Workman after January 3, 2013 and only after Captain Thurgood questioned her about the altercation. Facts ¶¶ 43-44, 55 (Mojazza Depo., p. 117-18, 121; Thurgood Depo., pp. 31-32; Guido Smith Depo., pp 68-71).

5.  Ms. Mojazza admits there were no texts between herself and Workman after the November 2, 2012 text. Facts ¶¶ 61-62 (Mojazza Depo., pp. 152-53. In that text, Workman concluded by saying he did not want to make her uncomfortable. Facts ¶ 61 (Text, Ex. 9).

6.  Ms. Mojazza raised nothing to the City about harassment between November 11, 2012 and the basement incident at her home, where she had invited Workman. *See* Facts ¶¶ 18, 33-34, 43, 55-56 (Thurgood Depo., pp. 31-32, 35; Mojazza Depo., pp. 102-03, 117-18, 121-25, 128).

7.  Ms. Mojazza admits that by the time she invited Workman to her home she thought things were better and the "sexual stuff" was behind them. Facts ¶¶ 33-34 (Mojazza Depo., pp. 102-03).

8.    Ms. Mojazza testified she could not remember whether anything happened with
      Workman between November 11, 2012 and the time in December when she
      invited Workman to her home.  Facts ¶ 56 (Mojazza Depo., p. 128).

9.    Ms. Mojazza's and Workman's time sheets for December 2012 showed they were
      on shift/calls together that month only on 12/9/12 for one hour on Call No. 820.
      There was a potential overlap at 5 pm on December 25, 2012 since Ms. Mojazza
      worked from 7 am on 12/14/12 until 5 pm on 12/25/12, and Workman worked
      from 5 pm on 12/25/12 until 7 am on 12/26/12.  *Compare* Mojazza Time Sheets,
      Ex. 12 *to* Workman Timesheets, Ex. 13.

**D.    Unreasonable Failure To Take Advantage of Preventive/Corrective Action.**

a.    ". . . 'while proof that an employee failed to fulfill the corresponding obligation of
      reasonable care to avoid harm is not limited to showing an unreasonable failure to
      use any complaint procedure provided by the employer, a demonstration of such
      failure will normally suffice to satisfy the employer's burden . . .'" *Uragami v.
      Home Depot USA, Inc.*, 2005 WL 2177232, *7 (D. Utah) (quoting *Faragher v.
      City of Boca Raton*, 524 U.S. 775, 807 (1998)).

b.    An employer's action in doing nothing about a sexual harassment complaint is
      reasonable when the employee informs the employer she does not wish to pursue
      a complaint.  *Helm v. Kansas*, 656 F.3d 1277, 1291 (10th Cir. 2011).

c.    An employee unreasonably fails to take advantage of preventive or corrective
      opportunities or avoid harm otherwise, when the employee unreasonably delays in
      reporting harassment.  *Helm v. Kansas*, 656 F.3d 1277, 1291 (10th Cir. 2011).

**Relevant Undisputed Facts**

1. Ms. Mojazza did not report sexual harassment and want something done about it until at least the exit interview, conducted on or about January 19, 2013, after her termination. She raised sexual harassment by Workman when the interview was near the end. Chief Smith stated he had statements after the altercation from Captain Thurgood and Captain Love that she did not want to pursue it, and asked her point blank whether she told these supervisors she did not want to pursue it and she responded, "Yes, I did not want to pursue that at that time." Facts ¶¶ 117-18 (Trans. Exit Interview, pp. 22-23). She then said, "[a]nd now I would like to pursue it." Trans. Exit Interview, pp. 22-23. Chief Smith then asked Ms. Mojazza in the exit interview to write up a statement "pertaining to sexual harassment with Lindsay Workman." *Id.,* pp. 24-25.

2. Ms. Mojazza did not write up a list. She reported it to Keith Johnson on January 22, 2013, a few days later. Facts ¶ 126 (Sexual Harrassment Report & Interviews, Ex. 24).

3. Ms. Mojazza admits she told Captain Thurgood on November 3, 2012 that she did not want to make a sexual harassment complaint against Workman, and that she said to him: "I'm going to try and continue to get [Workman] to stop and will keep you updated." Facts ¶ 23 (Mojazza Depo., pp. 49-50).

4. Ms. Mojazza went to Captain Thurgood about Workman after January 3, 2013 and only after he asked her about the altercation. Facts ¶¶ 43-44, 55 (Mojazza Depo., p. 117-18, 121; Thurgood Depo., pp. 31-32; Guido Smith Depo., pp 68-71).

5.     Ms. Mojazza admits there were no texts between herself and Workman after the

November 2, 2012 text.  Facts ¶¶ 61-62 (Mojazza Depo., pp. 152-53.  In that text,

Workman concluded by saying he did not want to make her uncomfortable.  Facts

¶ 61 (Text, Ex. 9).

6.     Ms. Mojazza raised nothing to the City about harassment between November 11,

2012 and the basement incident at her home, where she had invited Workman.

*See* Facts ¶¶ 18, 33-34, 43, 55-56 (Thurgood Depo., pp. 31-32, 35; Mojazza

Depo., pp. 102-03, 117-18, 121-25, 128).

7.     Ms. Mojazza admits that by the time she invited Workman to her home she

thought things were better and the "sexual stuff" was behind them.  Facts ¶¶ 33-

34 (Mojazza Depo., pp. 102-03).

8.     Ms. Mojazza testified she could not remember whether anything happened with

Workman between November 11, 2012 and the time in December when she

invited Workman to her home.  Facts ¶ 56 (Mojazza Depo., p. 128).

9.     Ms. Mojazza's and Workman's time sheets for December 2012 showed they were

on shift/calls together that month only on 12/9/12 for one hour on Call No. 820.

There was a potential overlap at 5 pm on December 25, 2012 since Ms. Mojazza

worked from 7 am on 12/14/12 until 5 pm on 12/25/12, and Workman worked

from 5 pm on 12/25/12 until 7 am on 12/26/12.  *Compare* Mojazza Time Sheets,

Ex. 12 *to* Workman Timesheets, Ex. 13.

**E.     The City's Preventive and Remedial Actions.**

a.     "An employer's response is adequate if it takes remedial and preventive measures

that are 'reasonably calculated to end the harassment.'"  *Dunlap v. Spec Pro, Inc.,*

939 F.Supp.2d 1075 (D. Colo. 2013) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)).

b.   "Reasonably calculated responses include a prompt investigation, proactive solicitation of complaints, employee transfers, or warnings to offending employees." *Dunlap v. Spec Pro, Inc.*, 939 F.Supp.2d 1075 (D. Colo. 2013) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)).

c.   "The 'should-have-known' formulation is, in effect, a showing that the employer was negligent in failing to stop harassment." *DeBord v. Mercy Health Sys.of KS.* 737 F.3d 642, 650 (10th Cir. 2013).

d.   Having a sexual harassment policy is an affirmative defense and can be viewed as whether an employer acted reasonably to prevent sexual harassment. *Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011).

e.   That an employer promulgated a sexual harassment policy and dissemination of the policy reflects on its face that the employer acted reasonably to prevent sexual harassment. *Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011).

f.   Employers act reasonably "as a matter of law when they [adopt] valid sexual harassment policies, distribute[] those policies to employees via employee handbooks, and either provide no sexual harassment training or provide[] training only to managers." *Helm v. Kansas*, 656 F.3d 1277, 1289 (10th Cir. 2011) (citations omitted).

g.   Where employer has a sexual harassment policy including complaint procedures, and that is disseminated to employees, the employer as a matter of law has exercised "reasonable care" to prevent sexual harassment. *Uragami v. Home*

*Depot USA, Inc.*, [2005 WL 2177132, \*\*5-6 (D. Utah)](#) (citing *[Conatzer v. Medical](#)*

*[Prof. Bldg. Servs., Inc.](#)*[, 255 F.Supp.2d 1259, 1268 (N.D. Okla. 2003))](#).

 h. An employee's claim that she is unaware of the employer's sexual harassment

policy fails if she signed an acknowledgment form stating she understood it was

her responsibility to read and understand policies in the employee handbook since

the employee has at least constructive knowledge. *[Helm v. Kansas](#)*[, 656 F.3d](#)

[1277, 1289 (10th Cir. 2011)](#) (citing *[Shaw v. AutoZone, Inc.](#)*[, 180 F.3d 806, 811 (7th](#)

[Cir. 1999))](#).

**Relevant Undisputed Facts**

1. Chief Smith can recall at least three separate occasions when the City provided

him with sexual harassment training. Facts ¶ 6 (Guido Smith Depo., p. 23). The

City also provided him with its handbook, which contains a sexual harassment

policy, and he could ask questions about that. *Id.,* pp. 23-24; *see also* Sexual

Harassment Policy, Ex. 4.

2. The City has a sexual harassment policy in its employee handbook. Sexual

Harassment Policy, Ex. 4.

3. Chief Smith received training on personnel policies and procedures in staff

meetings. Facts ¶ 6 (Guido Smith Depo., pp. 24-25). He received such training

prior to Ms. Mojazza's termination. *Id.,* pp. 25-29.

4. Chief Smith provided training on sexual harassment to his "leadership group" at

monthly officers meetings, *i.e.*, he trained captains and battalion chiefs. Facts ¶ 7

(Guido Smith Depo., p. 29). Those trained included Captains Brian Thurgood and

Richard Love. *Id.,* p. 30.

5.      Chief Smith testified that he instructed his chain of command that "if they learned of instances of sexual harassment they were to take immediate action." Facts ¶ 8 (Guido Smith Depo., p. 32). He testified that he believes this applies to a *complaint* of harassment, not just a comment. *Id.,* p. 33.

6.      Chief Smith provides sexual harassment training to all new hires within eight weeks of their hiring date via a PowerPoint presentation. Facts ¶ 9 (Guido Smith Depo., pp. 30, 34); *see also* PowerPoint, relevant page, Ex. 5.

7.      Ms. Mojazza received PowerPoint sexual harassment training on November 27, 2012. Facts ¶ 10 (FFD Probationary Firefighter 8 Week Performance Review (marked at Chief Presentation), Ex. 6; Guido Smith Depo., pp. 43-44). Workman received URMMA sexual harassment training on 12/13/12. *See* Workman Time Sheets, Ex. 13, at Bates No. 1013).

8.      When Ms. Mojazza was hired, she received an employee handbook that contained a sexual harassment policy and signed a statement that she had received that handbook. Mojazza Confirmation Receipt Handbook, Ex. 7.

9.      Ms. Mojazza testified that she attended a PowerPoint presentation by Chief Smith, but when asked about the sexual harassment portion of the presentation, said "I don't remember anything from his presentation." Facts ¶ 13 (Mojazza Depo., pp. 167-68).

10.      Captain Thurgood testified that he has received sexual harassment training through the City, and knows the City had a sexual harassment policy that includes a reporting policy. Facts ¶ 14 (Thurgood Depo., pp. 17-18).

**F.    The City's Correction of Sexual Harassment**

a.    Although an employer's acting reasonably to remedy the sexual harassment generally is part of an affirmative defense with regard to an employer's potential liability for sexual harassment by a supervisor, it may also be viewed as an element of whether an employer acted reasonably to prevent sexual harassment. *Helm v. Kansas*, 656 F.3d 1277, 1290 (10th Cir. 2011).

b.    To show that it acted reasonably to correct any sexual harassment, the employer must show it acted "'reasonably promptly on [the]complaint when [the employer] was given proper notice of her allegations as required under the complaint procedure.'" *Helm v. Kansas*, 656 F.3d 1277, 1290 (10th Cir. 2001) (citing *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2011)).

c.    A vague complaint is not "proper notice." *Helm v. Kansas*, 656 F.3d 1277, 1291 (10th Cir. 2011).

**Relevant Undisputed Facts**

1.    Ms. Mojazza did not report sexual harassment and want something done about it until the exit interview, conducted on or about January 19, 2013—after her termination.  She raised sexual harassment by Workman when the interview was near the end.  Chief Smith stated he had statements after the altercation from Captains Thurgood and Love that she did not want to pursue it, and he asked her point blank whether she told these supervisors she did not want to pursue it and she responded, "Yes, I did not want to pursue that at that time."  Facts ¶ 117 (Trans. Exit Interview, pp. 22-23).  She then said, "[a]nd now I would like to pursue it."  Trans. Exit Interview, p. 23.  Chief Smith then asked Ms. Mojazza to

write up a statement "pertaining to sexual harassment with Lindsay Workman." (*Id.,* pp. 24-25).

2.    Ms. Mojazza admits she told Captain Thurgood on November 3, 2012 that she did not want to make a sexual harassment complaint against Workman, and that she said to him: "I'm going to try and continue to get [Workman] to stop and will keep you updated." Facts ¶ 23 (Mojazza Depo., pp. 49-50).

3.    Ms. Mojazza went to Captain Thurgood about Workman after January 3, 2013 and only after he asked her about the altercation. Facts ¶¶ 43-44, 55 (Mojazza Depo., p. 117-18, 121; Thurgood Depo., pp. 31-32; Guido Smith Depo., pp 68-71).

4.    Ms. Mojazza admits there were no texts between herself and Workman after the November 2, 2012 text. Facts ¶¶ 61-62 (Mojazza Depo., pp. 152-53. In that text, Workman concluded by saying he did not want to make her uncomfortable. Facts ¶ 61 (Text, Ex. 9).

5.    Ms. Mojazza raised nothing to the City about harassment between November 11, 2012 and the basement incident at her home, where she had invited Workman. *See* Facts ¶¶ 18, 33-34, 43, 55-56 (Thurgood Depo., pp. 31-32, 35; Mojazza Depo., pp. 102-03, 117-18, 121-25, 128).

6.    Ms. Mojazza admits that by the time she invited Workman to her home she thought things were better and the "sexual stuff" was behind them. Facts ¶¶ 33-34 (Mojazza Depo., pp. 102-03).

7.    Ms. Mojazza testified she could not remember whether anything happened with Workman between November 11, 2012 and the time in December when she invited Workman to her home.  Facts ¶ 56 (Mojazza Depo., p. 128).

8.    Ms. Mojazza's and Workman's time sheets for December 2012 showed they were on shift/calls together that month only on 12/9/12 for one hour on Call No. 820. There was a potential overlap at 5 pm on December 25, 2012 since Ms. Mojazza worked from 7 am on 12/14/12 until 5 pm on 12/25/12, and Workman worked from 5 pm on 12/25/12 until 7 am on 12/26/12.  *Compare* Mojazza Time Sheets, Ex. 12 *to* Workman Timesheets, Ex. 13.

9.    Regarding the incident in Ms. Mojazza's basement, Ms. Mojazza had invited Workman to her home when she was alone there, and it did not occur in the workplace.  Facts ¶¶ 30-32, 35-36 (Mojazza Depo., pp. 67-68, 98-99, 102-03). She testified she avoided him thereafter.  Facts ¶ 36 (Mojazza Depo., p. 107).

10.   Workman testified that after the basement incident he immediately left Ms. Mojazza's apartment, and avoided being alone with her thereafter.  Facts ¶ 52 (Workman Depo., p. 53).

## II.    TITLE VII GENDER DISCRIMINATION CLAIM.

### A.    No *Prima Facie* Case.

a.    Plaintiff has the initial burden of establishing a *prima facie* case of gender discrimination by showing she:  (a) is a member of a protected category; (b) was otherwise qualified for the position at issue and was performing her job in a satisfactory manner; (c) an adverse action was taken against her; and (d) a similarly situated person outside the protected class was treated differently than she was treated.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

**Relevant Material Facts**

1.     Part (b) not met because she was not performing her job in a satisfactory manner. She had shown Captain Thurgood and FF Smith on separate occasions a photo of a man exposing his genitalia, and used f*** while on the job in a public place and in the presence of Farmington citizens.  Facts ¶¶ 65-69, 73-77, 79-80 (Thurgood Depo., pp. 7, 9-10;  Guido Smith Depo., pp. 74-7-77, 99, 101, 103, 105-06, 110, 111-12, 116; Trans. Exit Interview, Ex. 15; Firefighter Code of Ethics (signed by Mojazza), Ex. 16); Facts ¶¶ 86-87 (Todd Smith Depo., pp. 9, 11, 23-24, 31, 33-34, 42, 27; Todd Smith Statement, Ex. 21).

2.     Part (d) not met because cannot show a similarly situated person who showed a sexually graphic photo to another City employee, or who used f*** while on the job in a public place and in the presence of Farmington citizens.

3.     No evidence of another employee saying f*** in the presence of Farmington citizens.  FF Todd Smith never heard anyone use it in front of Farmington citizens.  Facts ¶¶ 97, 100 (Todd Smith Depo., pp. 23-24, 27).

**B.**     **City's Legitimate, Non-Discriminatory Reason for Termination.**

a.     Once plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate nondiscriminatory reason for the employment decision.  The employer does not carry the burden of proof, but merely the burden of production, *i.e.*, "the burden of explaining clearly the nondiscriminatory reasons for its actions."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

**Relevant Undisputed Facts**

1.    Chief Smith testified he terminated Ms. Mojazza for showing the sexually graphic photo to co-worker FF Smith and Captain Thurgood, and using f*** while on the job in a public place and in the presence of Farmington citizens.  Facts ¶¶ 68, 79, 105-107, 110-111, 113-114 (Trans. Exit Interview, pp. 4-5, 9-10, 13-15  Guido Smith Depo., pp. 106, 110).

2.    Ms. Mojazza's exit interview, which she secretly taped, reflects that she agreed she knew she was terminated for the sexually graphic photo and for using f*** in the presence of Farmington citizens.  Facts ¶¶ 106 (Trans. Exit. Interview, pp. 4-5).  She claimed she was not on duty when she showed the photo.  Facts ¶ 110 (Trans. Exit Interview, p. 9).

3.    The photo shown by Ms. Mojazza is graphic.  *See* Photo, Ex. 33 (filed confidentially under seal).

4.    Both Captain Thurman and FF Todd Smith, to whom Ms. Mojazza showed the photo, thought she was bragging when she showed it to them and were troubled by her showing it.  Facts ¶¶ 21, 87, 89 (Thurgood Depo., pp. 60-64, 67;  Todd Smith Depo., pp. 33-34; Todd Smith Stmt., Ex. 21).

**C.    Once Burden of Production Met, Employee Must Show Pretext.**

a.    Once the employee presents a legitimate, non-discriminatory reason for the employment action, the burden returns to the employee to prove by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973).

b.  "[A] reason cannot be proved to be 'a pretext for discrimination unless it is shown *both* that the reason is false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

c.  "A plaintiff seeking to show pretext 'often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.'" *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106 (10th Cir. 2007) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

d.  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

e.  Once the employer presents a legitimate, non-discriminatory reason for the employment action, the employee's burden of proving pretext "merges with the ultimate burden of persuading the court that . . . [the employee] has been the victim of intentional discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  This means the employee must prove he/she would not have been terminated *but for* the impermissible factor. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993).

f.  "The burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

**Relevant Undisputed Facts**

1.  No evidence of a male or even a female being treated differently by Chief Smith.

2.	Chief Smith ordered clothing for Mojazza just as he did for others.  Facts ¶¶ 63-64 (Clothing Order and Emails, Ex. 14; Mojazza Depo., pp. 156-65).

3.	No evidence other employee used f*** in the presence of Farmington citizens.

4.	FF Todd Smith testified he never heard anyone except Ms. Mojazza use the f-word in front of citizens.    Facts ¶¶ 97, 100 (Todd Smith Depo., pp. 23-24, 27).

5.	No evidence any other employee showed sexually graphic photo.

6.	After the investigation, Workman was terminated.  Facts ¶ 26 (Personnel Action Form, Ex. 26).

7.	As a result of the investigation, Keith Johnson stated Ms. Mojazza was also involved in inappropriate conduct, and she could have come forward in the exit interview with her accusations but she had not.  Facts ¶¶ 132-33 (Sexual Harassment Report & Interview, Ex. 24, at Bates FC0095).

8.	After the investigation, Dave Millheim stated in letter to Ms. Mojazza that he would have terminated her under the sexual harassment policy for her own inappropriate conduct.  Facts ¶ 135 (Millheim Letter to Mojazza, Ex. 27).

**D.	Strong Inference of No Discrimination Since Chief Smith Hired and Fired.**

a.	"[I]n cases where 'the employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'"  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citation omitted).

b.	"'[T]hat same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions.'"  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citation omitted).

**Relevant Unndisputed Facts**

1.  Chief Smith fired Ms. Mojazza a few days before she had been employed four months.

2.  Chief Smith interviewed Ms. Mojazza.  Facts ¶ 29 (Mojazza Depo., pp. 91-93).

3.  Chief Smith gave tips and pointers to Ms. Mojazza on being hired by City, and those were helpful to her being hired.  Facts ¶ 28 (Mojazza Depo., pp. 57-58)

4.  Chief Smith advised Ms. Mojazza on how to interview with the City.  Facts ¶ 28 (Mojazza Depo., pp. 57-58).

## III.  TITLE VII RETALIATION CLAIM.

### Standard

An employer may not discriminate "against an individual because that individual 'has opposed any practice made an unlawful employment practice' by Title VII or because that individual 'has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing' pursuant to Title VII." *Pinkerton v. Colorado Dep't of Transp.,* 563 F.3d 1052, 1064 (10th Cir. 2009) (citations omitted).

### A.  Retaliation Claims Can Be Shown Through Circumstantial or Direct Evidence.

a.  A retaliation claim may be made through either direct evidence or circumstantial evidence.  *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).

### B.  No Direct Evidence Shown, *i.e.,* Mixed-Motive Theory.

a.  An employee can establish retaliation through direct evidence, sometimes called a "mixed motive" theory, which is a direct showing "that retaliatory animus played a 'motivating part' in the employment decision."  *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989 (plurality decision)).  "'A plaintiff will be entitled to the burden-shifting analysis set out in *Price Waterhouse* upon

presenting evidence of conduct or statements by the persons involved in the decision making process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'" *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008) (citation omitted).

**Relevant Undisputed Facts**

1.    No evidence of retaliatory animus.

2.    No statements and no conduct showing retaliatory animus.

3.    Prior to hiring her, Chief Smith advised Ms. Mojazza on how to interview with the City and gave her tips and pointers on how to be hired.  Facts ¶ 28 (Mojazza Depo., pp. 57-58).

4.    Ms. Mojazza stated in the exit interview that Captain Thurgood was a good supervisor to her and had done everything she asked.  Facts ¶¶ 115, 120 (Trans. Exit Interview, pp. 15, 25).

5.    Captain Thurgood had reported to Chief Smith the use of f*** in front of the public, and the showing by Ms. Mojazza of the photo.  Facts ¶¶ 65-69, 73-77, 79-80 (Thurgood Depo., pp. 7, 9-10;  Guido Smith Depo., pp. 74-7-77, 99, 101, 103, 105-06, 110, 111-12, 116; Trans. Exit Interview, Ex. 15; Firefighter Code of Ethics (signed by Mojazza), Ex. 16); Facts ¶¶ 86-87 (Todd Smith Depo., pp. 9, 11, 23-24, 31, 33-34, 42, 27; Todd Smith Statement, Ex. 21).

**C.    Even If Retaliatory Animus Was Shown, The City Would Take Same Action.**

a.    Once a plaintiff "proves that retaliatory animus was a motivating factor, the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive." *Fye v. Oklahoma Corp. Comm'n*, 516

F.3d 1217, 1224 (10th Cir. 2008) (citing *Price Waterhouse v. Hopkins*, 490 U.S.
228, 252 (1989 (plurality decision)).

**Relevant Undisputed Facts**

1.    In a letter to Ms. Mojazza after the concluding of the sexual harassment

       investigation, Dave Millheim stated he would have terminated her too based on

       the investigation.  Facts ¶ 135 (Millheim Letter to Mojazza (Feb. 5, 2013), Ex.

       27).

2.    The investigative report comments on Ms. Mojazza's own violation of City's

       standards on inappropriate conduct.  Facts ¶ 133 (Sexual Harassment Report &

       Interviews, Ex. 24, at Bates FC0095).

**D.    Retaliation Not Shown Through Circumstantial Evidence.**

a.    To prove a retaliation claim through indirect or circumstantial evidence, a burden

       shifting analysis is used.  *Pinkerton v. Colorado Dep't of Transp.,* 563 F.3d 1052,
       1064 (10th Cir. 2009) (citations omitted).

**E.    A *Prima Facie*  Case of Retaliation Probably Cannot Be Shown.**

a.    To establish a *prima facie* case of retaliation, a plaintiff must demonstrate (1) that

       he engaged in protected opposition to discrimination, (2) that a reasonable

       employee would have found the challenged action materially adverse, and (3) that

       a causal connection existed between the protected activity and the materially

       adverse action."  *Argo v. Blue Cross & Blue Shield of KS, Inc.*, 452 F.3d 1193,
       1202 (10th Cir. 2006).

b.    A causal connection can be shown by a temporal proximity between the protected

       activity and the adverse action, so that "'the closer it occurred to the protected

       activity, the more likely it will support a showing of causation.'".  *Uragami v.*

*Home Depot USA, Inc.*, 2005 WL 21772232, *8 (D. Utah) (citations omitted).

"…[T]he Tenth Circuit seems to have drawn the line somewhere around nine weeks . . ." *Id.*.

**Relevant Undisputed Facts**

1. There was no protected opposition to discrimination based on her telling <u>Captain Thurgood on November 11, 2012 that she did not want anything done, and her statement in the Exit Interview that she had not wanted to report before</u> but "now she was."  Facts ¶ 23 (regarding 11/11/12 (Mojazza Depo., pp. 48-49); Facts ¶ 118 (Trans. Exit Interview, p. 22).

**F.    City Can Show a Legitimate, Non-Discriminatory Reason.**

a. Once an employee has established a *prima facie* case of retaliation, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Meiners v. University of KS*, 359 F.3d 1222, 1229 (10th Cir. 2004).

**Relevant Undisputed Facts**

1. Chief Smith testified he terminated Ms. Mojazza for showing the sexually graphic photo to co-worker FF Smith and Captain Thurgood, and using f*** while on the job in a public place and in the presence of Farmington citizens.  Facts ¶¶ 68, 79, 105-107, 110-111, 113-114 (Trans. Exit Interview, pp. 4-5, 9-10, 13-15  Guido Smith Depo., pp. 106, 110)

2. Ms. Mojazza's exit interview, which she secretly taped, reflects that she agreed she knew she was terminated for the sexually graphic photo and for using f*** in the presence of Farmington citizens.  Facts ¶¶ 106 (Trans. Exit. Interview, pp. 4-5).

**G.    No Pretext Can Be Shown.**

a.    Once the employer articulates a legitimate reason for its action, the plaintiff must establish the employer's asserted reasons are pretextual. *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009) (citations omitted).

b.    "'In determining whether the proferred reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*.'" *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (internal quotation marks omitted) (emphasis in original).  The court does not ask "whether the employer's proferred reasons were wise, fair or correct" and asks only "whether [the employer] believed those reasons and acted in good faith upon those beliefs." *Id.* at 1094 (internal quotations omitted).

c.    "[T]he existence of subjective criteria alone is not considered evidence of pretext." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007).

d.    "Mere conjecture that [an employer] acted out of retaliation will not suffice to establish pretext." *Annett v. University of KS*, 371 F.3d 1233, 1240 (10th Cir. 2004).

e.    To show that asserted reasons are pretextual, the plaintiff must demonstrate the "proffered non-discriminatory reason is unworthy of belief." *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (citations omitted).  This can be done by the plaintiff "producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions of the employer's proffered reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did

not act for the asserted non-discriminatory reasons.'" *Id.* (quoting *Argo*, 452 F.3d at 1203 (citation omitted)).

f.    Temporal proximity alone is not sufficient to defeat summary judgment, and any such proximity between the protected activity and adverse action does not necessarily show the proffered reason is unworthy of belief; what must be shown to defeat summary judgment is evidence of pretext. *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009).

g.    A court will refuse "'to allow even very close temporal proximity to operate as a proxy for [the] evidentiary requirement that the plaintiff demonstrate pretext.'" *Clark v. Cache Valley Elec. Co.*, 2013 WL 3873219, *4 (D. Utah) (quoting *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (citation omitted)). "'To raise a fact issue of pretext, [the plaintiff] must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive.'" *Id.* (citation omitted)).

**Relevant Undisputed Facts**

1.    No evidence of a male or even a female being treated differently by Chief Smith.

2.    No evidence other employee used f*** in the presence of Farmington citizens.

3.    FF Todd Smith testified he never heard anyone except Ms. Mojazza use the f-word in front of citizens.  Facts ¶¶ 97, 100 (Todd Smith Depo., pp. 23-24, 27).

4.    No evidence any other employee showed sexually graphic photo.

5.    After the investigation, Workman was terminated.  Facts ¶ 26 (Personnel Action Form, Ex. 26).

6.    As a result of the investigation, Keith Johnson stated Ms. Mojazza was also involved in inappropriate conduct, and she could have come forward in the exit

interview with her accusations but she had not. Facts ¶¶ 132-33 (Sexual

Harassment Report & Interview, Ex. 24, at Bates FC0095).

**H.**     **Strong Inference of No Discrimination Because Chief Smith Hired and Fired.**

a.     "[I]n cases where 'the employee was hired and fired by the same person within a

relatively short time span,' there is 'a strong inference that the employer's stated

reason for acting against the employee is not pretextual.'" *Antonio v. Sygma*

*Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citation omitted)).

b.     "'[T]hat same actor' evidence gives rise to an inference, rather than a

presumption, that no discriminatory animus motivated the employer's actions.'"

*Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citation

omitted).

**Relevant Undisputed Facts**

1.     Chief Smith hired and fired Ms. Mojazza a few days before she had worked four

months.

2.     Chief Smith interviewed Ms. Mojazza. Facts ¶ 29 (Mojazza Depo., pp. 91-93).

3.     Chief Smith gave tips and pointers to Ms. Mojazza on being hired by City, and

those were helpful to her being hired. Facts ¶ 28 (Mojazza Depo., pp. 57-58).

4.     Chief Smith advised Ms. Mojazza on how to interview with the City. Facts ¶ 28

(Mojazza Depo., pp. 57-58).

<u>ARGUMENT</u>

**I.**     **THE SEXUAL HARASSMENT CLAIM SHOULD BE DISMISSED.**

Ms. Mojazza's cause of action under Title VII for co-worker sexual harassment should be

dismissed because: (a) the City had no constructive knowledge of sexual harassment, which

would have required a workplace permeated with offenses, and the major incident occurred out

1

of the workplace; (b) actual knowledge cannot be shown because Ms. Mojazza admits she told Captain Thurman on November 11, 2012 she did not want to pursue it, and she did not actually want to make a complaint until her exit interview; (c) she unreasonably failed to take advantage of preventive or corrective action in light of this; (d) the City took reasonable measures to prevent sexual harassment; (e) to the extend corrective action was needed the City's corrective actions were adequate.

In order to prove sexual harassment by a non-supervisory co-worker under a negligence theory the employee must establish (1) the employer had actual or constructive knowledge of the harassment and (2) the employer's remedial and corrective responses to the harassment were inadequate. *Dunlap v. Spec Pro, Inc.*, 939 F.Supp.2d 1075 (D. Colo. 2013) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998)).

"[A]ctual knowledge is established where the plaintiff has reported harassment to a management-level employee." *Adler,* 144 F.3d at 673. "Constructive knowledge may be inferred when the harassment is 'highly pervasive' and should, in the exercise of reasonable care, have been discovered by management-level employees." *Dunlap,* 939 F.Supp.2d at 1085.

## A.     The City Had No Constructive Knowledge

The City had no constructive knowledge because not one City employee except Ms. Mojazza ever saw alleged sexual harassment by Workman. *See* Facts ¶¶ 30-36, 61-62. Indeed, there was no discernable hostile work environment which might have caused constructive knowledge, since that would have required that "the workplace [be] permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). This environment must be both objectively and subjectively offensive. *Id.* at 21-22 (1993). ). To assess this a court should look

at the "frequency of the discriminatory conduct; its severity; whether it is psychologically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 22.  Further, "'run of the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.'" *Hutchinson v. City of Okla. City*, 919 F. Supp.2d 1163, 1174 (W.D. Okla. 2013) (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)). There was nothing whatsoever seen or reported by anyone with regard to Workman/Ms. Mojazza that would meet these standards.

It is significant here that one of Ms. Mojazza's allegations, the one concerning Workman's visiting her apartment and her allegation of what was said there, did not even take place in the workplace.  Facts ¶¶ 30-36.  There is no way the City could have known about this, and it cannot be responsible for Ms. Mojazza's inviting to her apartment someone she contends is sexually harassing her.  Nor could the City be responsible for what might have been said by them when they are there alone together.  What is important is what goes on in the workplace, which is the place an employer can do something about.

Accordingly, based on the foregoing, the City did not have constructive  knowledge.

### B.    Actual Knowledge Was Only After Ms. Mojazza's Exit Interview.

The City had actual knowledge only after Ms. Mojazza finally gave the City the information showing alleged harassment, which was after her exit interview.  Facts ¶¶ 22, 117-18,  Even accepting Ms. Mojazza's allegation that she first informed her supervisor, Captain Thurgood, on November 11, 2012 that she was uncomfortable with Workman, she also admits telling Captain Thurgood at that time that she did not want him to do anything.  Facts ¶ 22.   That Ms. Mojazza told Captain Thurgood on November 11, 2012 to do nothing, means the City had no actual knowledge at that point.

Informing Captain Thurgood that he should do nothing at that time also means that until she actually complained and gave details, Ms. Mojazza unreasonably failed to avoid harm—if indeed there was any workplace harm or action by Workman thereafter. The United States Supreme Court has recognized that ". . . 'while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden . . .'" *Uragami*, 2005 WL 2177232, *7 (quoting *Faragher v. City of Boca Rotan*, 524 U.S. 775, 807 (1998)). In fact, the Tenth Circuit recognizes that an employer's action in doing nothing about a sexual harassment complaint is reasonable when the employee informs the employer she does not wish to pursue a complaint. *Helm*, 656 F.3d at 1291.

Furthermore, since Ms. Mojazza contends she did not ask Captain Thurgood to do anything about Workman until at least January 3, 2013—nearly two months after her alleged first report, and after the altercation where both she and Workman had gotten in trouble, and likely after which there was no alleged harassment—she failed to take advantage of corrective measures. In fact, she refused to provide Chief Smith with information on the alleged harassment in the exit interview, and even said "Can I get back to you on that later?" Facts ¶ 104. Thus, if she had complaints when she was terminated she refused to voice them. The Tenth Circuit has pointed out that an employee unreasonably fails to take advantage of preventive or corrective opportunities or avoid harm otherwise, when the employee unreasonably delays in reporting harassment. *Helm*, 656 F.3d at 1291. This would apply to both stating she wanted nothing done on November 11, 2012, and that she did not actually make a complaint until after her termination.

**C.  The City's Remedial And Corrective Actions Were Adequate.**

Aside from the foregoing, the City's remedial and corrective actions were adequate.  It is undisputed that Ms. Mojazza told Captain Thurgood on November 11, 2012 that she was not reporting harassment and did not want anything done.  Facts ¶ 22.  Moreover, although she contends she told Captain Thurgood on or about January 3, 2013 that *now* she wanted something done about Workman, she then refused to give any details/information to Chief Smith.  Facts ¶¶ 104, 117-118.  There had been no texts since November 2, 2012 (Facts ¶¶ 61-62), and she actually invited Workman to her home after that alleged November 11, 2012 report.  Facts ¶¶ 18, 56.  Further, she and Workman worked together, at most, one hour in December 2012.  Facts ¶ 56.  She finally complained to Keith Johnson about a week after the exit interview. Facts ¶ 126.

Whether the City's remedial and corrective actions were adequate should be analogized to a situation of supervisor sexual harassment, where there is an affirmative defense by the employer which includes that the employer had a sexual harassment policy.  Having a sexual harassment policy is viewed as whether an employer acted reasonably to prevent sexual harassment.  *Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011).  The Tenth Circuit recognizes that an employer's promulgating a sexual harassment policy and disseminating that policy reflects on its face that the employer acted reasonably to prevent sexual harassment.  *Id.* The Tenth Circuit even instructs that employers act reasonably "as a matter of law when they [adopt] valid sexual harassment policies, distribute[] those policies to employees via employee handbooks, and either provide no sexual harassment training or provide[] training only to managers." *Id.* at 1289.  This district likewise has found that where the employer has a sexual harassment policy, including complaint procedures, which is disseminated to employees, that employer has as a matter of law has exercised "reasonable care" to prevent sexual harassment.

*Uragami v. Home Depot USA, Inc.*, 2005 WL 2177132, \*\*5-6 (D. Utah 2005) (citing *Conatzer v. Medical Prof. Bldg. Servs., Inc.*, 255 F.Supp.2d 1259, 1268 (N.D. Okla. 2003)).

Further, an employee's claim that she is unaware of the employer's sexual harassment policy fails if she signed an acknowledgment form stating she understood it was her responsibility to read and understand policies in the employee handbook, since the employee has at least constructive knowledge of that policy. *Helm*, 656 F.3d at 1289 (citing *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999)).

It is undisputed here that Farmington's handbook contained a sexual harassment policy. Sexual Harassment Policy, Ex. 4. Chief Smith both received training on sexual harassment and also trained his "leadership group" on it. Facts ¶¶ 6-7. Chief Smith trained all new employees via a PowerPoint presentation. Facts ¶¶ 9-10. It also is undisputed that Ms. Mojazza signed an acknowledgment that she had received that handbook and policy. Mojazza Confirmation Receipt Handbook, Ex. 7. She also received training by Chief Smith on sexual harassment in a PowerPoint. Facts ¶¶ 10, 13. Workman received training from URMMA, the City's insurer. Facts ¶ 10. Captain Thurgood received training. Facts ¶ 14. Accordingly, the City exercised reasonable care, of which Ms. Mojazza failed to take advantage. This is reflected in her telling Captain Thurgood that she did not want anything done on November 11, 2012, and her complaining only after all allegedly harassing conduct had long since ceased. Facts ¶ 23.

Furthermore, when Ms. Mojazza finally did provide the City with the details of alleged harassment, the City promptly conducted an investigation. Facts ¶¶ 126-32. Significantly, Ms. Mojazza refused to provide details to Chief Smith during the exit interview, even though he had told her to bring to the interview a list of her concerns. Facts ¶ 104. It is difficult for an employer to deal with a report of harassment when there are no details. In fact, the Tenth Circuit

recognizes that a vague complaint is not "proper notice" of alleged harassment. *Helm*, 656 F.3d at 1291.

The corrective action taken after the investigation was that the City terminated Workman's employment. Facts ¶ 134. This was done even though there is evidence, and the investigative report recognizes, that the banter/sexual conduct may have been and likely was mutual between Workman and Ms. Mojazza, at least at one point. Indeed, that Ms. Mojazza would invite to her apartment someone she allegedly was uncomfortable with is strong proof that whatever there may have been had been resolved to that point. Ms. Mojazza's and Workman's dialog in the November 2, 2012 text also shows that there was a resolution and that Workman had told her he did not want to make her uncomfortable. Facts ¶¶ 60-61.

In sum, Ms. Mojazza cannot show sexual harassment and the claim should be dismissed.

## II.     THERE WAS NO GENDER DISCRIMINATION.

Ms. Mojazza's claim for gender discrimination should be dismissed because she cannot show the reason for her termination is pretextual, including that she cannot show a similarly situated male or anyone else who was treated differently.

A gender discrimination claim is assessed under a shifting burden analysis. Under this, the plaintiff has the initial burden of establishing a *prima facie* case by showing she: (a) is a member of a protected category; (b) was otherwise qualified for the position at issue and was performing her job in a satisfactory manner; (c) an adverse action was taken against her; and (d) a similarly situated person outside the protected class was treated differently than she was treated. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Once plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate nondiscriminatory reason for the employment decision. Once the employer presents a legitimate, non-discriminatory reason for the employment action, the burden returns to the employee to

prove by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804-05.

> **A.** **Ms. Mojazza Cannot Establish a *Prima Facie* Case.**

Ms. Mojazza's claim fails because she cannot establish a *prima facie* case since she cannot show she was otherwise qualified for the position at issue and was performing her job in a satisfactory manner, and cannot show that a similarly situated person outside the protected class was treated differently than she was treated. *Hicks*, 509 U.S. at ___. Ms. Mojazza was not performing her job in a satisfactory manner because she violated the Firefighter Code of Ethics by showing to Captain Thurgood and FF Smith on separate occasions a graphic photo of a man exposing his genitalia, and because she used f*** while on the job in a public place and in the presence of Farmington citizens. Facts ¶¶ 65-69, 73-77, 79-80, 8687; Trans. Exit Interview, Ex. 15. As Chief Smith testified, the showing of the photo alone was sufficient to terminate her employment regardless of the situation. Facts ¶¶ 105-06, 110-111. Nor can she show a similarly-situated person who showed a sexually graphic photo to another City employee, or who used f*** while on the job in a public place and in the presence of Farmington citizens. Although there was a non-probationary City employee who was found to deliberately have had sexually graphic materials on his computer, that person was terminated and there is no evidence he showed those photos to others.

> **B.** **The City Can Articulate a Legitimate, Non-Discriminatory Reason For Termination.**

Even if Ms. Mojazza could present a *prima facie* case, the City has a legitimate, non-discriminatory reason for terminating her. Under this, the employer does not carry the burden of proof, but merely the burden of production, *i.e.*, "the burden of explaining clearly the nondiscriminatory reasons for its actions." *Burdine*, 450 U.S. 248, 252-53 (1981).

Chief Smith made clear his reason for terminating Ms. Mojazza, *i.e.*, (1) she used the word f*** while on duty, in uniform, and in the presence of Farmington citizens, and (2) she showed to Captain Thurgood and FF Smith a graphic photo of a man with genitalia exposed. Facts ¶¶ 68, 79. 105-07. 110-11. 113-14. Both of those men testified in deposition that her showing this photo to them was random, and that they felt that she was bragging about the photo. Facts ¶¶ 21, 87, 89). With this, the City has met its burden.

### C.    Ms. Mojazza Cannot Show Pretext.

Since the City has met it burden of production, the burden returns to Ms. Mojazza to prove by a preponderance of the evidence that the City's articulated reason is a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804-05. This burden of proving pretext "merges with the ultimate burden of persuading the court that . . . [the employee] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256. Under this, the employee must prove he/she would not have been terminated *but for* the impermissible factor. *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 842 (1st Cir. 1993). "[A] reason cannot be proved to be 'a pretext for discrimination unless it is shown *both* that the reason is false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (1993); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). "'A plaintiff seeking to show pretext 'often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.'" *Timmerman v. U.S. Bank, N.A.,* 483 F.3d 1106 (10th Cir. 2007) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 f.3d 1220, 1230 (10th Cir. 2000)). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir. 1997).

Furthermore, "in cases where 'the employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citation omitted). "'[T]hat same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions.'" *Id.* (citation omitted)).

Ms. Mojazza cannot meet any of these standards. It is undisputed that she showed the photo to others and that she used f*** in the presence of Farmington citizens. Thus, she cannot show this reason is *false*. Nor can she show a male or even female Farmington employee who did the same things—or even one of those things—and was not terminated. Although there may have been some bad language among firefighters, there is no evidence that any City employee or Fire Department employee used f*** in front of citizens. Facts ¶¶ 97, 100. There is no evidence anyone else ever showed a sexually graphic photo. Although the joking about Ms. Mojazza's dog may not have been optimal, it was not harassment and even she laughed although she claimed Chief Smith's comments were rude. Facts ¶ 121. It is also significant that Chief Smith both hired and fired Ms. Mojazza, and did it within about a 3-4 month period. Ms. Mojazza not only interviewed with Chief Smith, Captain Thurgood, and Captain Love, she testified that while she still was obtaining her certification Chief Smith gave her pointers on how to be hired at Farmington. Facts ¶¶ 28-29.

Moreover, although Ms. Mojazza's Complaint appears to criticize Chief Smith and/or the City and contend proper clothing/equipment was not ordered for her, the documents prove otherwise. Facts ¶¶ 63-64. Chief Smith spent a significant amount of time ordering gear, including gear for Ms. Mojazza. *See id.* She even admits she received gear but it was sometimes

too large.  Facts ¶ 63-64 (Mojazza depo., pp. 156-65).  However, Ms. Mojazza is a small woman and the evidence shows Chief Smith did everything he could to obtain clothing that would fit.

In sum, Ms. Mojazza's gender discrimination claim should be dismissed.

## III.    SUMMARY JUDGMENT IS WARRANTED ON THE RETALIATION CLAIM.

This Court also should grant summary judgment on Ms. Mojazza's Title VII retaliation claim.  Under Title VII, an employer may not discriminate "against an individual because that individual 'has opposed any practice made an unlawful employment practice' by Title VII or because that individual 'has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing' pursuant to Title VII."  *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009) (citations omitted).  A retaliation claim may be made through either direct evidence or circumstantial evidence.  *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).

### A.    Ms. Mojazza Cannot Show Retaliation Through Direct Evidence.

An employee can establish retaliation through direct evidence, sometimes called a "mixed motive" theory, which is a direct showing "that retaliatory animus played a 'motivating part' in the employment decision."  *Fye*, 516 F.3d at 1224 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989 (plurality decision)).  Once a plaintiff "proves that retaliatory animus was a motivating factor, the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive."  *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989 (plurality decision)).

To meet the retaliatory animus as "motivating factor, "'[a] plaintiff will be entitled to the burden-shifting analysis set out in *Price Waterhouse* upon presenting evidence of conduct or statements by the persons involved in the decision making process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'"  *Fye*, 516 F.3d at 1224.

Ms. Mojazza cannot meet this burden to show retaliatory animus.  There is no comment or conduct that shows or even reflects that anyone had animus toward her.  Prior to hiring her, Chief Smith advised her on interviewing with the City and gave her tips and pointers.  Facts ¶ 28.  Nor did Chief Smith deliberately fail to order gear, or order misfitting gear, for her.  Facts ¶¶ 63-64; Mojazza Depo., pp. 156-65.  Ms. Mojazza stated in the exit interview that Captain Thurgood, who reported the photo and use of the "f-word" in public, was a good supervisor to her and had done everything she asked.  Facts ¶¶ 115, 120.  In short, there is nothing to show that there was animus toward Ms. Mojazza.

Further, even if Ms. Mojazza could show this, the evidence shows the City would have terminated her in any event.  In a February 5, 2013 letter to Ms. Mojazza, City Manager Dave Millheim about the investigation results, he informed her that he would have terminated her too based on the investigation.  Facts ¶ 135.  Indeed, the investigative report comments that it found that Ms. Mojazza had also violated City standards on inappropriate conduct.  Facts ¶ 133.

### B. Ms. Mojazza Cannot Prove Retaliation Through Indirect or Circumstantial Evidence.

Since there is no evidence or conduct showing retaliatory attitude by the decision maker, Ms. Mojazza must show retaliation through indirect or circumstantial evidence.  To prove a retaliation claim through indirect or circumstantial evidence, a burden shifting analysis is used.  *Pinkerton*, 563 F.3d at 1064 (citations omitted)).  This means Ms. Mojazza must first show a *prima facie* case of retaliation.  Once this is made, the City must meet a burden of production to show a legitimate, non-discriminatory reason for her termination.  Once the City does this, Ms. Mojazza has the burden to show the reason is a pretext.

### C. Ms. Mojazza Cannot Establish a *Prima Facie* Case.

"To establish a *prima facie* case of retaliation,[Ms. Mojazza] must demonstrate (1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross & Blue Shield of KS, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). A causal connection can be shown by a temporal proximity between the protected activity and the adverse action, so that "'the closer it occurred to the protected activity, the more likely it will support a showing of causation.'" *Uragami*, 2005 WL 21772232 at *8 (D. Utah 2005) (citations omitted)). "...[T]he Tenth Circuit seems to have drawn the line somewhere around nine weeks . . ." *Id.*

Ms. Mojazza cannot make a *prima* facie case because she cannot meet (1) because tere was no protected opposition to discrimination. The facts show she told Captain Thurgood on November 11, 2012 that she did not want anything done, and she stated in the exit interview (after termination) that she had not wanted to report before but "now she was." Facts ¶¶ 23, 118.

### D. The City Can Show a Legitimate, Non-Discriminatory Reason for Termination.

Once an employee has established a *prima facie* case of retaliation, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Meiners v. University of KS*, 359 F.3d 1222, 1229 (10th Cir. 2004).

Chief Smith made clear his reason for terminating Ms. Mojazza, *i.e.*, (1) she used the word f*** while on duty, in uniform, and in the presence of Farmington citizens, and (2) she showed to Captain Thurgood and FF Smith a graphic photo of a man with genitalia exposed. Facts ¶¶ 68, 79. 105-07. 110-11. 113-14. Both of those men testified in deposition that her

showing this photo to them was random, and that they felt that she was bragging about the photo. Facts ¶¶ 21, 87, 89). With this, the City has met its burden.

### E. Ms. Mojazza Cannot Show Pretext.

Since the City can articulate a legitimate non-discriminatory reason for its action, Ms. Mojazza must establish the City's asserted reasons are pretextual. *Pinkerton*, 563 F.3d at 1064. To show pretext, she must demonstrate the "proffered non-discriminatory reason is unworthy of belief." *Id.* at 1065 (citations omitted)). She can do this by "producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions of the employer's proffered reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Id.* (quoting *Argo*, 452 F.3d at 1203 (citation omitted)).

What Ms. Mojazza cannot do is rely on temporal proximity alone to attempt to show pretext. The Tenth Circuit has stated that temporal proximity alone is not sufficient to defeat summary judgment, and that any such proximity between the protected activity and adverse action does not necessarily show the proffered reason is unworthy of belief; what must be shown to defeat summary judgment is *evidence of pretext*. *Pinkerton*, 563 F.3d at 1065. Indeed, a court must refuse "'to allow even very close temporal proximity to operate as a proxy for [the] evidentiary requirement that the plaintiff demonstrate pretext.'" *Clark v. Cache Valley Elec. Co.*, 2013 WL 3873219, *4 (D. Utah 2013) (quoting *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (citation omitted))). "'To raise a fact issue of pretext, [the plaintiff] must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive.'" *Id.* (citation omitted).

Further, under Tenth Circuit law, "'In determining whether the proferred reason for a decision was pretextual, [a court] examine[s] the facts as they appear *to the person making the*

*decision*.'" *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (internal quotation marks omitted) (emphasis in original). The court does not ask "whether the employer's preferred reasons were wise, fair or correct" and asks only "whether [the employer] believed those reasons and acted in good faith upon those beliefs." *Id.* at 1094 (internal quotations omitted). "[T]he existence of subjective criteria alone is not considered evidence of pretext." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007). Thus, "[m]ere conjecture that [an employer] acted out of retaliation will not suffice to establish pretext." *Annett v. University of KS*, 371 F.3d 1233, 1240 (10th Cir. 2004). Even if an employee makes a *prima facie* case of retaliation, if the employee cannot show the employer's reason is pretextual the retaliation claim fails. *Uragami,* 2005 WL 21772232 at *10.

In addition, there is a strong inference of no retaliation where the same person hires and fires, *i.e.*, "where, as here, the 'the employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (citation omitted). "'[T]hat same actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions.'" *Id.*

Based on these standards, there is no evidence of pretext and Ms. Mojazza's claim fails. First, Chief Smith both hired and fired her within 3-4 months. He was the decision maker and although Ms. Mojazza may not like his reasons, he believes those reasons and acted on them. Ms. Mojazza violated the Code of Ethics and that was sufficient for termination. Nor did Chief Smith have to give her warnings and, in fact, Workman did not receive a warning before he was terminated.

There also is no evidence the reasons given for Ms. Mojazza's termination are false, inconsistent, or implausible.  That Ms. Mojazza demonstrated excellent technical skills during her probationary period is irrelevant.  The photo alone was enough to warrant termination in Chief Smith's view.

Moreover, any temporal proximity does not establish pretext because there is no circumstantial evidence of a retaliatory motive.  *Clark*, 2013 WL 3873219 at *4.

In sum, Ms. Mojazza cannot establish a *prima facie* case of retaliation, and she cannot meet her burden to show pretext.  Her retaliation claim should be dismissed.

## <u>CONCLUSION</u>

Based on the foregoing, Farmington City asks this Court to grant summary judgment in its favor, and dismiss all causes of action pleaded by Ms. Mojazza.

Dated this 29th day of June, 2015.

SNOW, CHRISTENSEN & MARTINEAU

/s/ Judith D. Wolferts

_____
Camille N. Johnson
Judith D. Wolferts
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June, 2015, I caused the foregoing **Motion and**

**Memorandum in Support of Defendant's Motion for Summary Judgment** to be served upon

the following party by e-mailing the same to:

> Andrew W. Stavros
> Stavros Law, P.C.
> 11693 South 700 East, Suite 200
> Draper, Utah 84020
> Attorneys for Plaintiff Sarah Mojazza
> andy@stavroslaw.com

/s/ Kathy Pickett

_____