Camille N. Johnson (5494)
Judith D. Wolferts (7023)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Suite 1100
P.O. Box 45000
Salt Lake City, Utah 84145-5000
Telephone: (801) 521-9000
Fax: (801) 363-0400
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| SARAH MOJAZZA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>FARMINGTON CITY, a Utah municipal corporation,<br><br>Defendant. | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:14-CV-00017-DN<br><br>Judge David O. Nuffer<br><br>Magistrate Judge Evelyn J. Furse |

Farmington City submits this reply memorandum supporting its Motion for Summary Judgment.

**REPLY IN SUPPORT OF DEFENDANT'S STATEMENT OF FACTS**

The City replies as follows in support of its Statement of Facts. Only Facts that are not undisputed or not deemed immaterial by Ms. Mojazza are addressed here.

**B.     Sexual Harassment Training and Policy**

6.      Ms. Mojazza disputes this Fact in part and contends that in Chief Smith's deposition he did not recall dates, etc., of training he received on sexual harassment.  Although he did not recall specific dates, Chief Smith testified he did receive training.

9.      Ms. Mojazza disputes this Fact in part and contends the PowerPoint presentation has only one sentence on Sexual Harassment.  That "sentence" is a bullet point on a screen shot, not the verbal actual training.  Ms. Mojazza also received an Employee Handbook containing a Sexual Harassment Policy and signed a statement that she received that.  *See* Mojazza Confirmation Receipt Handbook (Def's Ex. 7).

10.      Ms. Mojazza disputes this Fact in part because the "Eight Week Performance Review says nothing about sexual harassment training."  However, that Review marks off "Complete Chief Presentation," which presentation *includes* sexual harassment instruction/training.  *See* Def's Ex. 6.

12.      Ms. Mojazza disputes this Fact in part, apparently suggesting the Sexual Harassment Policy would be somewhere other than the Employee Handbook.  However, the Employee Handbook definitely contains a Sexual Harassment Policy.  *See* Def's Ex. 4.

13.      Ms. Mojazza disputes this Fact in part, contending she does not recall the sexual harassment portion of Chief Smith's PowerPoint presentation.  She actually said "I don't remember anything from his presentation" which is not a claim that she never heard it.  Mojazza Depo., pp. 167-68 (Def's Ex. 2).

14.      Ms. Mojazza does not dispute this Fact but contends Mr. Workman did not recall receiving sexual harassment training.  However, his timesheet reflects a 1.5 hour video training

by URMMA, which provides sexual harassment training to City employees. *See* Workman Time Sheet, Ex. 28, attached hereto. Mr. Workman testified the video training referenced on his time sheet could have been sexual harassment training. Workman Depo., p. 38 (Def's Ex. 10). He also signed the acknowledgment of Receipt of Policies and Procedures, just as Ms. Mojazza did. *See* Workman Acknowledgment, Ex. 29, attached hereto.

15. FACT**:** *Regarding the text message, Captain Thurgood testified that both parties agreed they were at fault. Thurgood Depo., p. 12.*

Ms. Mojazza disputes this and states Captain Thurgood actually said "It was determined that both parties had agreed that both parties were at fault and both parties had partaken or both were as equally guilty in whatever harassment, if you're calling that harassment, both were at fault." Plt's Opp. Mem., p. 14. Ms. Mojazza only underscores that both parties agreed they were at fault about language in the text message. Ms. Mojazza also misstates that Captain Thurgood testified she reported to him that Mr. Workman "touched her, on her breasts and buttocks." *See id.* In the referenced pages, Captain Thurgood states only that Ms. Mojazza told him "that he [Workman] may have touched her butt entering a fire truck or said something to her." Def's Ex. 8 (Thurgood Depo., p. 21).

17-18. Ms. Mojazza disputes Facts 17 & 18 in part. Her dispute appears to be that she "first complained to Captain Thurgood about Workman on November 11, 2012." *See* Plt's Opp. Mem., pp. 15-16. Although Captain Thurgood disputes she told him this on November 11, 2012, accepting Ms. Mojazza's statement, she admitted in her deposition that she told Captain Thurgood on November 11, 2012 not to do anything and that "I will keep you [Thurgood] updated." *See* Def's Stmt. Facts ¶ 23. The next time Ms. Mojazza said anything to Captain

Thurgood about Mr. Workman was when Captain Thurgood was counseling her about the shouting match that she and Mr. Workman got into on December 25, 2012.

21.     Ms. Mojazza disputes this Fact in part, stating Captain Thurgood could not recall the context of the discussion he and Ms. Mojazza were having at the time she showed him the photo.  However, his testimony reflects he knew the conversation did not involve seeking help:

Q:  Is it your testimony that she wasn't discussing what to do about that situation with you when she showed you the picture?

A (Thurgood): No.

Q:  She just pulled [the photo] up on her phone and said, "Look and see this"?

A: From what I recall it was very random.

Q: Okay.  She just came up to you and showed you the picture?

A: I'm sure we were talking about something at the time.  I don't think she just came and grabbed my shirt and said, "Hey, Bryan, look at this."  I can't recall.  I don't recall.

Q: Okay.  What do you recall?  Tell me about what she did.  Did she tell you she was going to show it or did she just show you?

A: She just showed me the picture.

Q: She didn't even give you any context in which--

A: Not that I recall, no.

Q: She didn't let you know what might be on the picture?

A:  She may have said "Hey, look, this is the guy that raped me," or whatever.  But I can't recall for sure, so don't cite me word for word because I don't know.  I told you over and over I don't know what the context of that discussion we were having prior to the showing of the picture.

Q: And I understand that.  I just want to know--I mean, because typically--you know, you would agree with me that it wouldn't be normal for an employee to just come and show somebody that's naked to their supervisor at work out of the blue, right?

A: Definitely.  Very out of the ordinary.

Q: Right.  So you don't recall what you were discussing, I understand that.  All I want to know is did she say anything to you about what was on the picture before you saw the picture?

A:  I'll tell you once again, I do not recall what was said before she showed me the picture.

Q: Okay.  So you don't have any reason to believe that she wasn't--that she was simply telling you--asking you--you don't have any reason to dispute that she was asking you for help about what to do about this guy?

A:  She was definitely not asking me for help.

Q:  Okay.  You're certain about that.

A:  I'm certain about that.

Q: And why is that?

A: Because she already told me in prior conversation that she was working on personal problems in her life and that she--and I had already told her, "We need to report this if this is true.  If you are, in fact, telling me this is true, this needs to be reported."  And she begged and pleaded with me and told me, "No this is nothing. It's not that big of a deal," blah, blah, blah.  And when she showed me that picture it was more of a boasting, "hey, look at this.  Check it out."  And I was like, "What in the crap, dude?  I don't"--so it was shocking to me that she would have that on her-- with someone that apparently raped her, why would you have that on your phone and show other people and not report that?  Why are you"--so the whole process in my--

Def's Ex. 8 (Thurgood Depo., pp. 61-64).

**C.      Ms. Mojazza's Testimony.**

22.      Ms. Mojazza disputes this Fact in part, stating the reason she did not want to go to

Chief Smith is omitted in the Fact and that she did not want speak to Chief Smith because she

allegedly was worried about her career.  This illustrates only that she did not want anything done.

33.      FACT: *Ms. Mojazza testified that by the time she invited Workman to her apartment, she and Workman were friendly again: "I felt like things were better.  Yeah, I felt like we were going in the right direction until that happened.  That was the--that was what happened*

*for me to go tell Bryan, 'Look, I need you to take care of this.'" She said, "I felt like we had reached a point where, you know, the sexual stuff was behind us, you know, but dates, I can't remember." Mojazza Depo., pp. 102-103.*

Ms. Mojazza's statement speaks for itself. Moreover, her statement that she was "harassed" by Mr. Workman on December 25, 2012 is incorrect. Mr. Workman and Captain Jed Done needed to get a uniform out of the bedroom in the fire station where Ms. Mojazza was sleeping, and were knocking/banging on the bedroom door and this caused Ms. Mojazza to get angry. She and Mr. Workman began yelling at each other with no sexual overtones at all.

### E.    Ms. Mojazza's Use of Profanity in the Workplace.

41.    Ms. Mojazza disputes this Fact in part, contending only that Captain Thurgood did not give her a verbal warning and that she should have been given a written warning for her language. This reflects only that Ms. Mojazza actually did use inappropriate language.

### G.    Workman's Testimony and Statement.

46.    FACT: *Workman admitted to Captains Thurgood and Love when they talked to him about the altercation and Ms. Mojazza's allegations, that he had sent the text messages. Workman Depo., pp. 23-25.*

Ms. Mojazza disputes this, stating Captains Thurgood and Love were not investigating the December 25, 2012 incident but instead were investigating sexual harassment. This does not create an issue of fact and shows only that Ms. Mojazza's being confronted by superiors about the altercation is what led to her making accusations about Mr. Workman.

48.    FACT: *Workman contends he never touched Ms. Mojazza inappropriately. Workman Depo., pp. 28-30. He contends that when he went to her home at her invitation to see about installing a door, she said to him that she could pay him with oral sex. Id., p. 30.*

Ms. Mojazza disputes this Fact, stating the City itself found Mr. Workman "inappropriately touched Mojazza." This does not create an issue of fact. Mr. Workman was

terminated for inappropriate conduct.  Ms. Mojazza testified she invited Mr. Workman to her apartment and was alone when he arrived.  Mojazza Depo., pp. 98-100 (Def's Ex. 2).  She could not remember whether she showed him her bedroom.  *Id.,* p. 102.  She also testified she did not recall whether she said to Mr. Workman about her bedroom when he was at her apartment, "That's where the f****** takes place."  *Id.*, p. 105.

49.     Ms. Mojazza disputes this Fact in part, stating that when she and Mr. Workman joked it was not personal or sexual, and when it became personal she went to Captain Thurgood. This does not create a question of fact, since Ms. Mojazza admits she told Captain Thurgood at that time that she did not want him to do anything.

50.     Ms. Mojazza objects to this Fact, alleging it was inadmissible hearsay when Mr. Workman testified that those in Ms. Mojazza's certification class stated that she would say after class, "Okay, who is up for a b***j**."  This is not hearsay under Fed. R. Evid. 801 because it is Ms. Mojazza's statement and is offered against her.  It does not create a question of fact because others at the City also testified about Ms. Mojazza's language.

**J.      Work Clothing for Ms. Mojazza.**

63.     Ms. Mojazza disputes this Fact in part "to the extent [it] implies there are no other bases for [her] discrimination claims, including her claim of discriminatory discharge." Significantly, Ms. Mojazza does not dispute that "[h]er complaint is that her gear did not fit her (in particular, a t-shirt with FFD emblem), not that she did not receive any gear."

64.     Ms. Mojazza disputes this Fact but only to the extent it implies her complaint was anything other than that she "was not provided with the proper sized clothing."  This does not

create a question of fact.  Her gear was ordered in available sizes, but Ms. Mojazza is a small

woman--5'3" and 120 lbs.  *See* Mojazza Driver's License, Ex. 30 hereto.

**K.     Ms. Mojazza's Termination.**

71.     FACT:  *Chief Smith testified that at the time he terminated Ms. Mojazza, he had not been made aware from Ms. Mojazza of any details about "texting and harassment."  Guido Smith Depo., p. 83 (Def's Ex. 1).*

Ms. Mojazza disputes this Fact, but does not dispute that she herself told him nothing.

Her response also reflects that Chief Smith knew she did not want Captain Thurgood to pursue

certain things.  Moreover, the exit interview transcript shows Ms. Mojazza refused to tell Chief

Smith anything and, when asked whether she wanted to complain, she stated "Can I get back to

you on that later?"  Trans. Exit Interview, p. 3 (Def's Ex. 15).  Ms. Mojazza's explanation as to

why she disputes this Fact even supports that she did not want to complain about Mr. Workman:

> Chief Smith:  The question was, Sarah, did you or did you not tell your supervisors, who were instructed by the chief to investigate this, that you did not want to pursue it?

> Mojazza:  Chief, my question--

> Chief Smith:  Yes or no?  Honestly.  Because I need to make sure that my guys are doing their job, too.  Yes or no?

> Mojazza:  Yes, I did not want to pursue this at the time.

> Chief Smith:  Okay.

> Mojazza:  And then I was fired two business days later.

> Chief Smith:  Okay.

> Mojazza:  And now I would like to pursue it.

Trans. Exit Interview, p. 22 (Def's Ex. 15).

72-74, 76.    Ms. Mojazza disputes Facts 72-74 & 76.  This does not create an issue of fact because the statements are taken directly from the Exit Interview, which Ms. Mojazza secretly taped and later produced to the City in discovery.  *See* Def's Ex. 15 (Trans. Exit Interview).

**M.    Todd Smith Statement and Testimony.**

89.    Ms. Mojazza disputes this Fact in part, noting that the "Look at him and how big he is" statement made by Todd Smith was not in his written statement.  This Fact cites to Todd Smith's deposition where he was asked detailed questions.  It does not create an issue of fact.

92.    Ms. Mojazza disputes this Fact in part, stating Todd Smith did not include in his written statement that he thought she was bragging when she showed him the graphic photo.  This does not create an issue of fact, since this Fact cites to Todd Smith's deposition where he was being asked detailed questions.

93.    Ms. Mojazza disputes this Fact in part, stating "Todd Smith never made any complaint about Mojazza showing the image to him."  This does not create an issue of fact.  Ms. Mojazza showed the sexual photo to a co-worker in the workplace, and this is not disputed.

**N.    Exit Interview.**

121.    Ms Mojazza disputes this Fact in part, stating that in the exit interview Ms. Mojazza "raised numerous other concerns" regarding the jokes about her dog.  This does not create an issue of fact.  She admitted in her deposition that she herself might have been laughing in the exit interview when she brought up her dog.

122.    Ms. Mojazza disputes this fact in part, contending "the cited testimony does not indicate that she meant there was never anything in writing about counseling on her language."

This does not create an issue of fact, since the context shows she acknowledges that she was counseled, although not formally.

<u>**RESPONSE TO PLAINTIFF'S DISPUTE OF DEFENDANT'S STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS**</u>

Du.Civ.R. 7.1(b)(2)(B) does not appear to permit arguments/legal citations in a reply memorandum in support of a motion for summary judgment, and the City will not comment on Ms. Mojazza's citations of law in this section. Accordingly, the City replies only to any disputes Ms. Mojazza had as to the City's Undisputed Facts in this section.

**I.     TITLE VII CO-WORKER SEXUAL HARASSMENT CLAIM.**

Farmington's Relevant Undisputed Facts states there is "No evidence of a hostile work environment being created by Workman." Whether there is a hostile work environment is a question of law and requires that the "workplace" be "permeated with 'discriminatory intimidation, ridicule, and insult,'" must be *both* objectively and subjectively offensive, and "run of the mill boorish, juvenile, or annoying behavior . . . is not the stuff of a Title VII hostile work environment claim." *See* Citations in Def's Part I.B. Ms. Mojazza contends the City has provided no evidence on this. That is because there *is* no evidence of workplace conduct by Mr. Workman that would meet this standard.

The City stands by its Relevant Facts that support dismissal of this cause of action. Ms. Mojazza admits most of these Relevant Facts including: (1) she told Captain Thurgood on November 11, 2012 that she did not want to complain or have anything done at that time; (2) there were no text messages between Ms. Mojazza and Mr. Workman after the November 2, 2012 text; (3) Ms. Mojazza never complained about Mr. Workman between November 11, 2012 and until after the non-sexual verbal argument they had on December 25, 2012; (4) Ms. Mojazza

invited Mr. Workman to her basement apartment where she contends the alleged impropriety occurred; (5) in December 2012, Ms. Mojazza and Mr. Workman had no shifts together and only worked together once.

## II.    TITLE VII GENDER DISCRIMINATION CLAIM.

### A.    *Prima Facie* Case.

#### Relevant Material Facts

1.    Ms. Mojazza disputes that she was not performing her job in a satisfactory manner, pointing to her "three perfect performance evaluations" and that she had not received "any write-ups or progressive discipline in accordance with the Farmington City Fire Department" verbal warning chart, etc.  This does not create an issue of fact.  There is no dispute that she showed Captain Thurgood and Todd Smith a graphic photo of a man with his genitalia exposed.  This is a violation of at least the Firefighter Code of Ethics.  Chief Smith testified that he did not have to first make an investigation as to Ms. Mojazza's showing the graphic photo because she was a probationary employee and that "as a probationary employee showing illicit pictures of that nature is unacceptable."  Guido Smith Depo., p. 29 (Def's Ex. 1); *see also* Utah Code Ann. §§ 10-3-1105, -1106 (stating/recognizing probationary employees do not have property interest in government employment so that typical due process of notice and an opportunity to be heard prior to termination do not apply).  Chief Smith also testified regarding the disciplinary forms that they were documentation, but "we may terminate an employee without going through the verbal, a warning or a final warning if it is real serious in nature." Guido Smith Depo., p. 50, attached hereto as Ex. 31.

2.	Ms. Mojazza disputes that she "cannot show a similarly situated person who showed a sexually graphic photo to another employee, or who used f\*\*\* while on the job in a public place and in the presence of Farmington citizens."  She contends there is no evidence of her using f\*\*\* in that context.  However, Todd Smith was with Ms. Mojazza when she said this and he testified that she *did* use that word in that context and that she is the only person in FFD he ever heard do that.  Def's Stmt. of Facts ¶¶ 86, 93-94, 96-97, 100.  There also is no evidence of any other firefighter showing a sexually graphic photo.

3.	Ms. Mojazza disputes that there is "no evidence of another employee saying f\*\*\* in the presence of Farmington citizens."  This does not create an issue of fact.  Todd Smith was with Ms. Mojazza when she said this and he testified that she *did* use that word in that context and that she is the only FFD person he ever heard do that, and that she was the only probationary employee he ever heard swear in the workplace.  Def's Stmt. of Facts ¶¶ 86, 93-94, 96-97, 100.

**B.	City's Legitimate, Non-Discriminatory Reason for Termination.**

**Relevant Undisputed Facts**

1.	It is significant that Ms. Mojazza does not dispute this Fact, *i.e.*, that Chief Smith terminated her for showing the sexually graphic photo and using f\*\*\* in the presence of Farmington citizens at the Bountiful Baskets event.

2.	Ms. Mojazza disputes that the exit interview transcript shows that "she agreed she was terminated" for the graphic photo and using f\*\*\* as indicated.  She then veers off into contending the exit interview shows she claimed her termination was unfair, that she had been discriminated against, and that she should have received formal discipline before being terminated.  This does not create an issue of fact, since pages 4-5 of the transcript of the exit

interview reflect that she knew it was "language got you into trouble" and that she showed the graphic photo. Her response to the comment about the photo was to concede she showed it to Captain Thurgood and Todd Smith, but "[t]hat was not a picture of my boyfriend." Trans. Exit Interview, pp. 4-5 (Def's Ex. 15).

### C. Once Burden of Production Met, Employee Must Show Pretext.

### Relevant Facts

1. Ms. Mojazza disputes that there is "No evidence of a male or even a female being treated differently by Chief Smith." To support this, she refers to a former Farmington Fire Department male employee who had inappropriate pictures on his work computer, and she states there was an investigation and the employee was terminated only after that was completed. This male employee and Ms. Mojazza are not similarly situated. Chief Smith testified the male was a "veteran employee." Guido Smith Depo., p. 127-28, Ex. 31 hereto. Ms. Mojazza was probationary. Chief Smith also testified that he learned of the images on the computer when the City's monitoring system "flagged inappropriate images" and Chief Smith met with the male employee to ask how the images got on his computer (*i.e.*, whether "solicited"). *Id.*, p. 125; *see also* Termination Report, Ex. 32 hereto. It is common knowledge that photos can be on a computer without an individual intentionally downloading them. By contrast, there is no question that Ms. Mojazza had kept a graphic photo on her cellphone. There also is no evidence the male employee showed images to anyone, whereas Ms. Mojazza did.

2. Ms. Mojazza disputes that clothing was ordered for her just as it was for others. She contends that although it was ordered, she "was not provided with the proper sized clothing." This does not create a question of fact. It is undisputed that clothing was ordered, and

the evidence shows clothing was ordered for Ms. Mojazza in "size small or x-small." *See* Clothing Orders, at FC0381 (Def's Ex. 14). The evidence also shows an email was sent on January 2, 2013 to firefighters--including Ms. Mojazza--regarding **Fire Duty Jackets** which states "Please let me know if your jacket size is not working for you. I am placing another small order within the next week," and Ms. Mojazza responded to this that "I would LOVE a small jacket." *Id.* at FC0357, FC0354. There also is evidence of Chief Smith's sending an email on November 8, 2012 to Phil Ross (clothing company employee) that states "can you get a pair of Extra Small Dragon Fire gloves on the way please." *Id.* at FC0351. These were for Ms. Mojazza. In addition, an email was sent to Phil Ross on November 7, 2012 stating that six individuals, including Ms. Mojazza, needed "full PPE Sets (Coat & Pants)" and "we can't hold off any longer." *Id.* at FC0350. With regard to the screen print shirts, the evidence shows Chief Smith was working with the vendor to obtain a "small" duty shirt for Ms. Mojazza, and the vendor had told him "she has never had to print 'Small' duty shorts before and is not 100% sure if our lettering on the back will fit." *Id.* at FC0348 (Oct. 28, 2012 email). He responded that if Ms. Mojazza could work "with a medium for now we will continue to work on our options." *Id.*

3.      Ms. Mojazza disputes that there is no evidence to show any other Farmington firefighter used "f***" in the presence of Farmington citizens. However, Ms. Mojazza herself has not provided any evidence that anyone ever did so.

4.      Ms. Mojazza disputes in part that FF Todd Smith "testified he never heard anyone except Ms. Mojazza use the f-word in front of citizens." However, Ms. Mojazza has not provided evidence to the contrary, Todd Smith's statement speaks for itself, and this does not create a question of fact.

5. Ms. Mojazza contends the City has not provided any evidence to support the Fact that there is "no evidence any other employee showed a sexually graphic photo." This does not create a question of fact because Ms. Mojazza herself did not provide any such evidence.

**D. Strong Inference of No Discrimination Since Chief Smith Hired and Fired.**

Ms. Mojazza disputes in part the legal standards/ramifications of the fact that Chief Smith both hired and fired her, but does not dispute that Chief Smith *was* the person who both hired and fired her and did so within a short time frame. Nor does she dispute that Chief Smith had given tips and pointers to Ms. Mojazza on how to be hired.

**III. TITLE VII RETALIATION CLAIM.**

**B. No Direct Evidence Shown, *i.e.*, Mixed-Motive Theory.**

1. Ms. Mojazza disputes that there is "no evidence of retaliatory animus" by contending Chief Smith threatened and attempted to dissuade her in the exit interview from "pursu[ing] a sexual harassment claim against Mr. Workman." This does not create an issue of fact. The exit interview transcript shows no threats or attempts to dissuade Ms. Mojazza from doing this:

> Mojazza: What is the status of my sexual harassment claim against [Workman]?
>
> Chief Smith: There--one, there's no official sexual harassment claim. We do have statements from both captains that addressed it, as they were ordered to do so by me at our officers meeting to follow up and find out what--because there was supposedly an altercation between the two of you. You're starting to use some words that concern me, and I would be very careful how you pursue the wording on that, because we can stop this and we can say, "We're not going to have any more discussion until our legal representation is here *and yours is*," so be careful on the words that you're choosing. This is a government corporation. It's a place of employment. We are an official entity. Did you claim a formal sexual harassment charge against [Workman]? Yes or no?
>
> Mojazza: Yes.

Mr. Smith: Okay. Then what we need to do is we'll end this right now. We will take it back to our legal advice, because I have not, as the fire chief, been made aware of a formal sexual harassment complaint. And by doing so and claiming so, you're entering in a whole new field. Are you ready to do that?

Mojazza: Are you advising me not to enter into this field, Chief?

Chief Smith: No. I'm just advising you of what direction you're taking.

Mojazza: I would like this to be taken care of, and I feel like I'm being terminated for showing a picture in confidence in an attempt to seek help over a situation that I was not sure how to proceed--seeing as though this happened in Farmington City, I did not want to tell the Farmington City cops, whom I work with, in fear that this would spread through the department. You are telling me that I am being terminated over a picture in that situation, and the gentleman who stuck his hand down my shirt, who touched my butt and asked me to come over to his house and have sex with him is still employed here.

Chief Smith: Okay. Now to answer this--we're going to end this discussion, and you'll need to get legal representation or some form of other help, because, as a city, I have statements from the supervisors who investigated it. The statements reflect something quite different, and the statements both reflect that both you and Mr. Workman did not want to pursue this further. Is that true?

Mojazza: I did not want him to lose his career over this.

Chief Smith: The question was, Sarah, did you or did you not tell your supervisors, who were instructed by the chief to investigate this, that you did not want to pursue it?

Mojazza: Chief, my question--

Chief Smith: Yes or no? Honestly. Because I need to make sure my guys are doing their job, too. Yes or no?

Mojazza: Yes, I did not want to pursue it at this time.

Trans. Exit Interview, pp. 20-22 (emphasis added)(Def's Ex. 15)). Ms. Mojazza's reference to

"happening in Farmington" is that the alleged rape occurred where she lived--Farmington.

2.      Ms. Mojazza disputes that there was "no statement and no conduct showing

retaliatory animus" and as support references the same statements by Chief Smith in the exit

interview which she contends shows he threatened her and tried to dissuade her from reporting. The City has the same response to this that it did to No. 1, *supra*.

5. Ms. Mojazza disputes this fact in part, stating she never said in the presence of citizens that "it's f****** cold outside." This does not create an issue of fact. Todd Smith testified that she used f*** in front of Farmington citizens at a Bountiful Baskets event, and this was Chief Smith's belief. Thurgood Depo., pp. 7, 9-10 (Def's Ex. 8); Guido Smith Depo., pp. 74-77, 99, 101, 103, 105-06, 111-12, 116 (Def's Ex. 1); Todd Smith Depo., pp. 9, 11, 23-24, 31, 33-34, 42, 47 (Def's Ex. 22). Further, in the exit interview Ms. Mojazza never denied the Bountiful Baskets incident, and commented only that others also swore. *See* Trans. Exit Interview (Def's Ex. 15).

**C. Even if Animus Was Shown, The City Would Take The Same Action.**

1. Ms. Mojazza disputes that Farmington City Manager Dave Millheim's letter states he would have terminated her too. Although this is correct, Mr. Millheim states that Ms. Mojazza also violated sexual harassment policy and points to Mr. Workman's being terminated for the same incidents.

2. Ms. Mojazza disputes that the Investigative Report says anything about her own violation of City standards through inappropriate conduct. To the contrary, the Investigative Report summary states Workman "engage[ed] in the sexual rhetoric that was going on between Sarah and himself and that he did overstep the bounds in texting her and touching her inappropriately. Also he allowed Sarah to do the same to him." *See* Def's Ex. 24.

**E.     A *Prima Facie* Case of Retaliation Cannot Be Shown.**

1.     Ms. Mojazza disputes that she cannot show "protected opposition to discrimination" and cites that she complained to Captain Thurgood after December 25, 2012. However, Ms. Mojazza's own statements in the exit interview show she did not complain and did not want to complain until after she was terminated.

**F.     City Can Show a Legitimate, Non-Discriminatory Reason.**

1.     Ms. Mojazza does not dispute that Chief Smith terminated her for showing the graphic photo and because she used f*** in front of Farmington citizens, but then contends she did not use that word and that Chief Smith should have conducted an investigation into why she showed the photo.  This does not create an issue of fact.  The City has only the burden of production here, and Ms. Mojazza admits Chief Smith believed these two things.

2.     Ms. Mojazza disputes that the exit interview transcript shows she knew she was terminated for showing the photo and using the improper word before Farmington citizens. However, the transcript speaks for itself, and the City has only a burden of production.

**G.     No Pretext Can Be Shown.**

1.     Ms. Mojazza disputes that there is no evidence of a male or female being treated differently by Chief Smith (*i.e.*, "similarly situated" issue).  As support, she references that f*** may have been used by other firefighters *at work*.  Work language was not the ultimate issue; language in front of citizens was the ultimate issue.  Ms. Mojazza also cites the male employee who was terminated for graphic images on his work computer, as being similarly situated. However, that male was a veteran employee and he had to be asked how the images came to be on his computer.  Nor did he show those images to others.  By contrast, Ms. Mojazza was a

probationary employee, had the graphic photo on her cellphone and did not delete it, and showed it to at least two Farmington employees.

2.      Ms. Mojazza disputes that "there is no evidence other employees used f*** in the presence of Farmington citizens."  This ignores that Todd Smith testified that she did.  Ms. Mojazza also uses as support that no citizen complained.  That is not relevant.  Ms. Mojazza also claims other firefighters used f***, but cites no evidence or incidents of this being done when the public was present.  This does not create an issue of fact.

3.      Ms. Mojazza disputes this fact in part, *i.e.,* she disputes that "FF Todd Smith testified he never heard anyone except Ms. Mojazza use the f-word in front of citizens."  As support, she cites that she did not use that word as Smith states, and states Todd Smith testified he heard other firefighters use that word.  This does not create an issue of fact.  Ms. Mojazza is the only person Todd Smith ever heard use that word in front of citizens.

4.      Ms. Mojazza disputes this fact, *i.e.*, she disputes there is "No evidence any other employee showed a sexually graphic photo."  As support, Ms. Mojazza states the male employee "was fired for looking at pornographic images on the Fire Department's computer."  It is true the male veteran firefighter was fired when it was determined he intentionally downloaded inappropriate (even pornographic) images on the computer.

<u>**ARGUMENT**</u>

**I.      "SAME ACTOR HIRES AND FIRES" INFERENCE APPLIES.**

Although Ms. Mojazza does not address it in argument, in response to the City's

Statement of Elements she disputes the relevance of the "same actor both hires and fires"

inference.  She contends the inference did not apply at the summary judgment stage in *Antonio v.*

*Sygma Network, Inc.,* 458 F.3d 1177 (10th Cir. 2006).  This is incorrect, and *Antonio* even

declined to deduce there was a "triable issue of fact" as to race and national origin discrimination

where the individuals at issue both hired and fired.  *Id.* at 1183.  That said, A*ntonio* does

recognize that despite this inference, a plaintiff can present "countervailing evidence of pretext."

*Id.* (stating "Antonio's evidence of pretext does not dispel this inference.").  For example, it is

illogical that Chief Smith would deliberately fail to purchase clothing/gear for Ms. Mojazza

"because of her gender" when he had encouraged her to apply for a firefighter position.

**II.      THE SEXUAL HARASSMENT CLAIM SHOULD BE DISMISSED.**

**A.      Some Legal Interpretations/Citations by Ms. Mojazza Are Incomplete.**

Ms. Mojazza begins her opposition to summary judgment on the sexual harassment claim

by citing various cases for certain standards.  At least one statement is incomplete.  Ms. Mojazza

cites to *Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164 (10th Cir. 2009), and states "'the

focus is not on whether the employer is liable for the bad acts of others, but whether the

employer itself is responsible for failing to intervene.'"  Plt's Opp. Mem., P. 96 (quoting

*Chapman*, 307 Fed. Appx. at 171).  However, that statement is a reference to the "negligence"

standard (which applies here) and to the requirement that to show "negligence" the plaintiff must

show the employer acted unreasonably, *i.e.*, "It is Ms. Chapman's burden to show that Carmike

acted unreasonably." *Chapman*, 307 Fed. Appx. at 171 (citing *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001)).

**B.  The City Had No Actual or Constructive Knowledge of Alleged Harassment.**

Ms. Mojazza does not contend the City had constructive knowledge of alleged sexual harassment, and this Court should reject Ms. Mojazza's contention there was "actual knowledge" of harassment because the City's personnel policy would have required Captain Thurgood to report alleged harassment even if the employee refused to report.  Plt's Opp. Mem., p. 98.  This attempts to evade that Ms. Mojazza admits:  (1) she told Captain Thurgood on November 11, 2012 she did not want to complain; (2) she told Captain Smith at the exit interview that both she and Mr. Workman told Captains Love and Thurgood after the altercation that neither wanted to complain; and (3) she refused to give details of alleged harassment in the exit interview.

Ms. Mojazza also appears to argue there was a contract with the City to investigate regardless of whether she wanted to report.  However, she did not plead a contract/implied contract claim based on any alleged duty created by personnel policies or sexual harassment policies.  Moreover, the City's personnel policies expressly state the policies/procedures "do not create a binding contract of any kind between the City and its employees or any other obligation or liability on the City," and Ms. Mojazza cannot rely on those to support a contract claim.  *See Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991) (clear and conspicuous disclaimer in handbook refutes contract).  *See also*, Handbook Disclaimer, Ex. 33 hereto.

Further, Ms. Mojazza's citation to *Swentek v. USAIR*, 830 F.2d 552 (4th Cir. 1987), for the proposition that "[a]ctual knowledge is shown in most cases where the plaintiff has reported harassment to management-level employees" does not assist her.  In *Swentek*, the plaintiff did

report and *did* want something done.  *Id.* at 558.  By contrast, Ms. Mojazza did not want to report and refused to provide information.  Nor does *Hirschfeld v. New Mexico Correctional Department*, 916 F.2d 572, 577 (10th Cir. 1990), assist because that case deals with a situation where the plaintiff complained and wanted something done when a co-worker hugged her and later kissed her.  *Id.* at 573-74.  Plaintiff was asked to submit a written statement and the co-worker was placed on administrative leave pending investigation, and plaintiff did not submit the written statement and instead filed a formal grievance.  *Hirschfeld* found defendant was not negligent.  By contrast, Ms. Mojazza declined to complain about alleged harassment and thus failed to take advantage of corrective measures, complaining only in or after the exit interview.

**C.   Ms. Mojazza Failed to Take Advantage of Preventive/Corrective Measures.**

There is no merit to Ms. Mojazza's argument that she did not unreasonably fail to take advantage of preventive/corrective measures.  First, she relies on *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257 (1998), to contend the employer is negligent "if it knew or should have known about the conduct and failed to stop it."  The City cannot locate Ms. Mojazza's quotation in the *Ellerth* majority opinion which discusses an affirmative defense to vicarious liability.  That quote appears instead to be something the dissent would say, since the dissent would not impose vicarious liability and would instead use a negligence standard for supervisor harassment.  In fact, the dissent's position was the *Ellerth* defendant could not be negligent because the plaintiff failed to tell the alleged harasser's superior about the alleged harassment.

Second, Ms. Mojazza disputes the City's reliance on *Helm v. Kansas*, 656 F.3d 1277 (10th Cir. 2011), contending *Helm*'s "holding is narrow" and apparently contending Captain Thurgood should have acted because she never told him "the matter was resolved."  Plt's Opp. Mem., p.

100.  This argument is without merit.  Courts in this Circuit have recognized "'the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.'"  *Bradford v. TMA Sys., L.L.C.*, 2014 WL 4199251, *12 (N.D. Okla. Aug. 25, 2014) (quoting *Shaw v. Autozone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)).  Indeed, *Helm* references *Autozone* as "particularly instructive."  *Helm*, 656 F.3d at 1289.  *Helm* also commented that whether timely correction was done "'turns on when [defendant] had proper notice of [Helm's] harassment complaint.'"  *Id.* at 1290 (citation omitted).  Ms. Mojazza knew she could actually complain, but she did not.  In fact, she did not actually decide to complain until she spoke to Keith Johnson after she was terminated.  It is undisputed that she did not bring a list of complaints to the exit interview, and she admits she twice told Captain Thurgood not to do anything.  Her reasons for doing this are irrelevant.  *See, e.g.*, *Perry v. Harris Chemin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997) ("law against sexual harassment is not self-enforcing"; employee has no duty under law to complain about harassment).  In short, this is not a situation where alleged harassment was open and could be seen by everyone.  Most significant:  (1) there were no texts after November 2012; (2) the most recent incident she alleges occurred at her home *after she invited* Mr. Workman there; (3) the December 25 altercation did not involve sex; (4) she and Mr. Workman worked together only once in December 2012.

### D.  The City's Actions Were Adequate and Based On Ms. Mojazza's Own Actions.

Ms. Mojazza argues that even if the *Faragher-Ellerth* defense was proper here, "there is a genuine issue of fact present due to the City's failure to adhere to its own sexual harassment policy," its ethics policy, its failure to take "any step to stop harassment," and because there is no

4

evidence Ms. Mojazza received sexual harassment training. Plt's Opp. Mem., p. 101. This argument should be rejected. It is disingenuous to contend she had no training on sexual harassment policy. There was a policy, complaint procedures, and the policy was disseminated to Ms. Mojazza and provided via PowerPoint. This is sufficient under *Uragami v. Home Depot USA, Inc.*, 2005 WL 2177132, **5-6 (D. Utah 2005). The Tenth Circuit has even stated a signed acknowledgement means the plaintiff has at least constructive knowledge of the policy. *See Helm*, 656 F.3d at 1289.

Furthermore, Ms. Mojazza appears to be arguing a contract claim when she contends the City had to investigate--even though Ms. Mojazza did not want to report. Plt's Opp. Mem., p. 102. But as discussed above, the City's Handbook does not create a contract, and there is no contract cause of action. There also is no question of fact because the City had a policy which was disseminated to Ms. Mojazza, she told Captain Thurgood to do nothing, and then told Chief Smith in the exit interview that she had not wanted to complain before "but now I do." Once she did complain, the City conducted an investigation after which Mr. Workman was terminated, even though the worst alleged incident did not occur in the workplace and despite disagreement as to whether Ms. Mojazza offered oral sex or Mr. Workman requested it. In short, the City's actions were adequate based on Ms. Mojazza's own actions.

## III.   THE GENDER DISCRIMINATION CLAIM SHOULD BE DISMISSED.

### A.   Ms. Mojazza Did Not Show a *Prima Facie* Case.

Ms. Mojazza has not shown that she can establish a *prima facie* case. In this context she contends regarding her establishing the first element (whether she was performing her job in a satisfactory manner) that "the *prima facie* case was meant to be flexible" and "this element is not

even relevant to the instant matter." Plt's Opp. Mem., p. 104. To support this she states she received "three perfect performance evaluations in a row" and had no disciplinary issues. *Id.* The City does not dispute she had good technical skills. However, she was a public employee and had been talked to more than once about workplace language. But she was terminated for using f*** while in uniform, on duty, and in the presence of Farmington citizens at an event that was not even a high stress situation such as a fire. Most important, she showed a graphic photo to two Farmington firefighters and their impression was this appeared to be bragging. There is no evidence that there was ever any other person who had done this, *i.e.*, she cannot show anyone similarly situated who was treated differently. The City even terminated the male veteran employee who had inappropriate images on his computer that no one saw.

**B.     Ms. Mojazza Was Not Disciplined More Harshly Than Others.**

There is no merit to Ms. Mojazza's contention she was disciplined more harshly than similarly situated male employees. Todd Smith testified Ms. Mojazza used f*** in the presence of Farmington citizens. Ms. Mojazza has submitted no evidence of anyone else ever doing that. As for Mr. Workman being given a verbal warning for his use of inappropriate language during the December 25 altercation with Ms. Mojazza, she did the same and would have received a warning had the City not learned about the photo and her use of f*** in front of citizens.

With regard to the male veteran employee, the images were on his computer with no indication of how they got there, *i.e.*, did he download them? The City had to determine his part in that, whereas the photo was kept on Ms. Mojazza's cellphone and she showed it to others.

Concerning firefighter gear, the evidence shows efforts made by Chief Smith to obtain clothing that fit Ms. Mojazza, who is a small woman. This does not reflect a "stereotype" of Ms. Mojazza. It is reality. Chief Smith had even given Ms. Mojazza tips on how to be hired.

Finally, Ms. Mojazza attempts to show the City treated her more harshly and engaged in gender stereotyping when Todd Smith testified he did not believe her story about rape, and when Chief Smith told her there would be "plenty of speculation why you have that picture on your phone." This is not stereotyping. There would be questions if anyone had that photo and was showing it.

C. **The Reasons For Ms. Mojazza's Termination Are Not False, *i.e.*, Not Pretextual.**

For the same reasons discussed below in Part IV(B), Ms. Mojazza cannot show the City's reasons for termination were a pretext for illegal gender discrimination.

## IV. THE RETALIATION CLAIM FAILS.

A. **Ms. Mojazza Has Not Established a *Prima Facie* Case of Retaliation.**

Ms. Mojazza contends the City does not dispute that she meets the first element of a retaliation claim, *i.e.*, that she "engaged in protected opposition to discrimination." *See* Plt's Opp. Mem., p. 110. This is incorrect. The City's initial memorandum argued she could not meet this element. *See* City's Init. Mem., p. 13. The City stated there that she could not meet this element because she told Captain Thurgood on November 11, 2012 that she did not want anything done, and stated in the exit interview that she had not reported before but "now" she was. *Id.* Ms. Mojazza now alleges it is a disputed issue as to whether she did not complain until the exit interview, but Ms. Mojazza's statement in the exit interview speaks for itself.

There also is no merit to Ms. Mojazza's contention Chief Smith intimidated and tried to persuade her in the exit interview not to report since the transcript shows this is false.

**B.      The City's Reasons Are Not Pretextual, *i.e.,* Not False.**

To show the City's reasons for termination were not pretextual, Ms. Mojazza must show "*both* that the reason is false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). This is a "but for" standard. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993). Ms. Mojazza cannot meet this standard. Even if this Court disregards Ms. Mojazza's use of f*** in front of Farmington citizens, the fact remains that she showed the photo to Captain Thurgood and Todd Smith. In fact, in the exit interview--which Ms. Mojazza secretly tape-recorded and where Chief Smith did not know what he said would be transcribed verbatim--Chief Smith told her that showing the photo alone would have been enough for him to terminate her. Chief Smith also hired and fired Ms. Mojazza in a short time-frame, and there is an *inference* of no discrimination in such cases. *Antonio*, 458 F.3d at 1183.

Furthermore, "'In determining whether the proffered reason for a decision was pretextual, [a court] examine[s] the facts as they appear *to the person making the decision*.'" *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (internal quotation marks omitted) (emphasis in original). This Court has the benefit of seeing for itself exactly what took place in the exit interview since Ms. Mojazza recorded it and that interview shows Chief Smith believed exactly what he told Ms. Mojazza. Regarding Ms. Mojazza's argument that it is false that she used f*** in front of Farmington citizens and even if she did, other firefighters also swore, that swearing was in the presence of other firefighters, not citizens.

Nor is there merit to Ms. Mojazza's argument that pretext can be shown by the City's not following its own policies or practices. Ms. Mojazza's basis for this contention is: (1) she should first have been warned/written up for using improper language; (2) the City should have investigated Mr. Workman earlier. However, Ms. Mojazza's use of f*** was the first in front of citizens. In addition the City did investigate once Ms. Mojazza decided to make a complaint.

### C.     No Inference of Pretext Based On Not Investigating *Why* Photo Shown.

The Court should disregard Ms. Mojazza's contention that pretext is inferred because there was no investigation about *why* she showed the photo. Plt's Opp. Mem., p. 114. As support, Ms. Mojazza cites *DeFreitas v. Horizon Investment Management Corp.*, 577 F.3d 1151 (10th Cir. 2009), and *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1158 (10th Cir. 2008), an ADA case. These cases do not support an inference. *DeFreitas* fired plaintiff while she was on FMLA medical leave, in part because of alleged complaints by subordinates that plaintiff was a poor supervisor. *DeFreitas*, 577 F.3d at 1151. The Tenth Circuit noted that despite some complaints being inconsistent with others and that defendant knew at least one complaint was false, defendant did not ask plaintiff *her* version of these events although she was "considered such a stellar employee for at least 18 of her 21 months with Horizon." *Id.* That is not the situation here. No reasonable jury would believe it was relevant *why* she showed a graphic photo of a man who did not even work for the City. Further, the *DeFreitas* employer had extremely specific written *requirements* before termination could occur, and the City does not.

In sum and using the language of this Court in *Riding v. ARUP Laboratories, Inc.,* 2013 WL 3049297, *5 (D. Utah June 17, 2013)*, Ms. Mojazza's situation would not "support a finding of a flawed or cursory investigation, and thus does not support an inference of pretext."

**D.      No Post Hoc Fabrication and Comparator Evidence Does Not Show Pretext.**

There is no evidence of post hoc fabrication of the reason for termination.  Ms. Mojazza contends there is such evidence because in the exit interview Chief Smith commented that when he terminated her he was "not in a position" to disclose all details.  Plt's Opp. Mem., p. 115.  She contends this was related to her inappropriate use of language.  *Id.*  Ms. Mojazza does not dispute she showed the photo, and that is not a "post hoc fabrication."  It also is clear from the exit interview that Chief Smith looked at whether he had to report Ms. Mojazza's alleged rape, and he told her in the interview that he did that.

There also is no merit to Ms. Mojazza's contention she should be compared to Chief Smith because he "used profanity and vulgar language" on the scene of a severe traffic accident.  Plt's Opp. Mem., p. 116.  A severe traffic accident does not equate to the cold day that Ms. Mojazza remarked on, and there is no evidence he used f***.  There also is no comparison between Ms. Mojazza and the male veteran employee since the City did not know how photos got on his computer and he did not show those to anyone.

**E.      The City's Reasons Are True.**

The Court should reject Ms. Mojazza's contention that she was such a "stellar employee" that it is "unworthy of credence" for the City to fire her for showing a graphic photo and using f*** in front of Farmington citizens.  She contends this is "soft and flimsy evidence" and self-serving to boot.  This is incorrect.  Ms. Mojazza was a probationary employee and, although she was performing the technical aspects of the work very well, she knew she was probationary.  Despite this, she showed the photo and Todd Smith testified she used f*** in front of citizens.

## <u>CONCLUSION</u>

Based on the arguments in this memorandum and the initial memorandum, defendant

Farmington City asks the Court to grant summary judgment in its favor and to dismiss all claims

of plaintiff Sarah Mojazza with prejudice and on the merits.

Respectfully submitted this 18th day of August, 2015.

SNOW, CHRISTENSEN & MARTINEAU

/s/ Judith D. Wolferts

_____

Camille N. Johnson
Judith D. Wolferts
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of August, 2015, I caused the foregoing **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be served upon the following party by e-filing the same with the U.S. District Court's CM/ECF e-filing system.

> Andrew W. Stavros
> Stavros Law, P.C.
> 11693 South 700 East, Suite 200
> Draper, Utah   84020
> andy@stavroslaw.com

/s/ Kathy Pickett
_____